# CENTRAL PACIFIC RAILROAD COMPANY *v.* CALIFORNIA.

## ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 559.   Argued January 15, 16, 1896. — Decided March 16, 1896.

The Central Pacific Railroad Company, being required by the laws of California to make returns of its property to the Board of Equalization for purposes of taxation, made a verified statement in which, among other things, it was said: "The value of the franchise and entire roadway, roadbed, and rails within this State is $12,273,785." The Board of Equalization determined that the actual value of the franchises, roadway, roadbed, rails, and rolling stock of the company within the State at that time was $18,000,000. The company not having paid the taxes assessed on this valuation, this action was brought by the State to recover them. *Held,*

(1) That the presumption was that the franchise included by the company in its return was a franchise which was not exempt under the laws of the United States, and that the board had acted upon property within its jurisdiction;

(2) That if the Board of Equalization had included what it had no authority to assess, the company might seek the remedies given under the law, to correct the assessment so far as such property was concerned, or recover back the tax thereon, or, if those remedies were not held exclusive, might defend against the attempt to enforce it;

(3) Where the property mentioned in the description could be assessed, and the assessment followed the return, the company ought to be

held estopped from saying that the description was ambiguous, and this notwithstanding the fact that the statement was made on printed blanks, prepared by the board.

The decision of the Supreme Court of the State that the findings of the trial court on the question of whether the franchises taxed covered franchises derived from the United States was conclusive, and is binding on this court.

The fact that a court, after giving its decision upon an issue, gives its opinion upon the manner in which it would have decided the issue under other circumstances, does not constitute an error to be reviewed in this court.

The Central Pacific company is a corporation of California, recognized as such by the acts of Congress granting it aid and conferring upon it Federal franchises, and it was not the object of those acts to sever its allegiance to the State or transfer the powers and privileges derived from it; nor did those consequences result from the acceptance of the grant by the corporation.

The property of a corporation of the United States may be taxed by a State, but not through its franchise.

Although a corporation may be an agent of the United States a State may tax its property, subject to the limitation pointed out in *Railroad Co.* v. *Peniston*, 18 Wall. 5.

It is immaterial in this case whether the railroad company operates its road under the franchise derived from the United States, or under that derived from the State.

When it is considered that the Central Pacific company returned its franchise for assessment, declined to resort to the remedy afforded by the state laws for the correction of the assessment as made if dissatisfied therewith, or to pay its tax and bring suit to recover back the whole or any part of the tax which it claimed to be illegal, its position is not one entitled to favorable consideration; but, without regard to that, the court holds, for reasons given, that the state courts rightly decided that the company had no valid defence to the causes of action proceeded on.

THIS was an action brought in the name of the People of the State of California against the Central Pacific Railroad Company in the Superior Court of the city and county of San Francisco, under section 3670 of the Political Code of that State, to recover a certain sum of money alleged to be due the State and various other sums of money alleged to be due eighteen counties of the State, for taxes for the fiscal year 1887 upon the assessment of the state Board of Equalization, judgment being demanded for the several sums of state and county taxes delinquent and unpaid as stated in the complaint, with

five per cent thereon added for delinquency and non-payment, and interest from the time of such delinquency; and also for costs of suit and attorneys' fees, as allowed by law.

The provisions of the state constitution on the subject of revenue are found in article XIII; and sections 1, 4, and 10 of that article and sections 3664, 3665, 3666, 3667, 3668, 3669, 3670, and 3671 of the Political Code of California are given in the margin.[1]

---

[1] SECTION 1. All property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law. The word "property," as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership: *Provided,* That growing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State, shall be exempt from taxation. The legislature may provide, except in the case of credits secured by mortgage or trust deed, for a reduction from credits or debts due to *bona fide* residents of this State.

SECTION 4. A mortgage, deed of trust, contract, or other obligation by which a debt is secured, shall, for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby. Except as to railroad and other quasi public corporations, in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security; if paid by the owner of the security, the tax so levied upon the property affected thereby shall become a part of the debt so secured; if the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and to the extent of such payment a full discharge thereof: *Provided,* That if any such security or indebtedness shall be paid by any such debtor or debtors, after assessment and before the tax levy, the amount of such levy may likewise be retained by such debtor or debtors, and shall be computed according to the tax levy for the preceding year.

SECTION 10. All property, except as hereinafter in this section provided, shall be assessed in the county, city, city and county, town, township, or district in which it is situated, in the manner prescribed by law. The franchise, roadway, roadbed, rails, and rolling stock of all railroads operated in more than one county in this State shall be assessed by the state Board of Equalization, at their actual value, and the same shall be apportioned to the

The complaint contained nineteen counts on nineteen alleged causes of action, and each count averred that the defendant was, at all times therein mentioned, a corporation organized

---

counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, cities, towns, townships, and districts.

### Provisions of Political Code.

SECTION 3664. The president, secretary, or managing agent, or such other officer as the state Board of Equalization may designate of any corporation, and each person, or association of persons, owning or operating any railroad in more than one county in this State, shall, on or before the first Monday in April of each year, furnish the said board a statement, signed and sworn to by one of such officers, or by the person or one of the persons forming such association, showing in detail for the year ending on the first Monday in March in each year —

1. The whole number of miles of railway in the State, and where the line is partly out of the State, the whole number of miles without the State and the whole number within the State, owned or operated by such corporation, person, or association:

2. The value of the roadway, roadbed, and rails of the whole railway, and the value of the same within the State:

3. The width of the right of way:

4. The number of each kind of all rolling stock used by such corporation, person, or association in operating the entire railway, including the part without the State:

5. Number, kind, and value of rolling stock owned and operated in the State:

6. Number, kind, and value of rolling stock used in the State, but owned by the party making the returns:

7. Number, kind, and value of rolling stock owned, but used out of the State either upon divisions of road operated by the party making the returns, or by and upon other railways.

Also showing in detail for the year preceding the first of January —

1. The gross earnings of the entire road:

2. The gross earnings of the road in the State, and where the railway is let to other operators, how much was derived by the lessor as rental:

3. The cost of operating the entire (road), exclusive of sinking fund, expenses of land department, and money paid to the United States:

4. Net income for such year and amount of dividend declared:

5. Capital stock authorized:

6. Capital stock paid in:

7. Funded debt:

8. Number of shares authorized:

9. Number of shares of stock issued:

and existing under the laws of the State of California, and engaged in operating a railroad in more than one county of that State; and that on August 13, 1887, the state Board of

10. Any other facts the state Board of Equalization may require:

11. A description of the road, giving the point of entrance into and the point of exit from each county, with a statement of the number of miles in each county. When a description of the road shall once have been given no other annual description thereafter is necessary, unless the road shall have been changed. Whenever the road, or any portion of the road, is advertised to be sold, or is sold for taxes, either state or county, no other description is necessary than that given by, and the same is conclusive upon the corporation, person, or association giving the description. No assessment is invalid on account of a misdescription of the railway or the right of way for the same.

If such statement is not furnished as above provided, the assessment made by the state Board of Equalization upon the property of the corporation, person, or association failing to furnish the statement is conclusive and final.

SECTION 3665. The state Board of Equalization must meet at the state capitol on the first Monday in August, and continue in open session from day to day, Sundays excepted, until the third Monday in August. At such meeting the board must assess the franchise, roadway, roadbed, rails, and rolling stock of all railroads operated in more than one county. Assessment must be made to the corporation, person, or association of persons owning the same, and must be made upon the entire railway within the State, and must include the right of way, bridges, culverts, wharves, and moles upon which the track is laid, and all steamers which are engaged in transporting passengers, freights, and passenger and freight cars across waters which divide the road. The depots, stations, shops, and buildings erected upon the space covered by the right of way, are assessed by the assessors of the county wherein they are situate. Within ten days after the third Monday of August, the board must apportion the total assessment of the franchise, roadway, roadbed, rails, and rolling stock of each railway to the counties, or cities and counties in which such railway is located, in proportion to the number of miles of railway laid in such counties, and cities and counties. The board must also, within said time, transmit by mail to the county auditor of each county, or city and county, to which such apportionment shall have been made, a statement showing the length of the main track of such railway within the county, or city and county, with a description of the whole of the said track within the county, or city and county, including the right of way, by metes and bounds, or other description sufficient for identification, the assessed value per mile of the same as fixed by a *pro rata* distribution per mile of the assessed value of the whole franchise, roadway, roadbed, rails, and rolling stock of such railway within the State, and the amount apportioned to the county, or city

Equalization, for the purposes of state and county taxation for the fiscal year ending June 30, 1888, assessed to defendant, then the owner and operator thereof in more than one county

and county. The auditor must enter the statement on the assessment roll or book of the county, or city and county, and where the county is divided into assessorial townships or districts, then on the. roll or book of any township or district he may select, and enter the amount of the assessment apportioned to the county, or city and county, in the column of the assessment book or roll as aforesaid, which shows the total value of all property for taxation, either of the county, city and county, or such township or district. On the first .Monday in October, the board of supervisors must make, and cause to be entered in the proper record book, an order stating and declaring the length of main track of the railway assessed by the state Board of Equalization within the county; the assessed value per mile of such railway, the number of miles of track, and the assessed value of such railway lying in each city, town, township, school and road district, or lesser taxing district in the county, or city and county, through which such railway runs, as fixed by the state Board of Equalization, which shall constitute the assessment value of said property for taxable purposes in such city, town, township, school, road, or other district; and the clerk of the board of supervisors must transmit a copy of each order or equalization to the city council, or trustees, or other legislative body of incorporated cities or towns, the trustees of each school district, and the authorized authorities of other taxation districts through which such railway runs. All such railway property shall be taxable upon said assessment, at the same rates, by the same officers, and for the same purposes, as the property of individuals within such city, town, township, school, road, and lesser taxation districts, respectively. If the owner of a railway assessed by the state Board of Equalization is dissatisfied with the assessment made by the board, such owner may, at the meeting of the board, under the provision of section thirty-six hundred and ninety-two of the Political Code, between the third Monday in August and the third Monday in September, apply to the board to have the same corrected in any particular, and the board may correct and increase or lower the assessment made by it, so as to equalize the same with the assessment of other property in the State. If the board shall increase or lower any assessment previously made by it, it must make a statement to the county auditor of the county affected by the change in the assessment; of the change made, and the auditor must note such change upon the assessment book or roll of the county as directed by the board. [In effect March 9, 1883.]

SECTION 3666. The state Board of Equalization must prepare each year a book, to be called "Record of Assessment of Railways," in which must be entered each assessment made by the board; either in writing, or by both writing and printing. Each assessment so entered must be signed by the chairman and clerk. The record of the apportionment of the assessments

in said State, the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad, then situated and being within said State, at the sum of eighteen millions of dollars.

---

made by the board to the counties, and cities and counties, must be made in a separate book, to be called "Record of Apportionment of Railway Assessments." In such last described book must be entered the names of the railways assessed by the board, the names of the corporation to which, or the name of the person or association to whom, each railway was assessed, the whole number of miles of the railway in the State, the number of miles thereof in each county, or city and county, the total assessment of the franchise, roadway, roadbed, rails, and rolling stock for purposes of State taxation, and the amount of the apportionment of such total assessment to each county, and city and county, for county, and city and county taxation. Before the third Monday of October of each year the clerk of the state Board of Equalization must prepare and transmit to the comptroller of the State, duplicates of the "Record of Assessment of Railways," and "Record of Apportionment of Railway Assessments," each certified by the chairman and clerk of the board, and to be known respectively as "Duplicate Record of Assessment of Railways," and "Duplicate Record of Apportionment of Railway Assessments." In the last named duplicate two columns must be added, in one of which the comptroller must enter the state taxes due the State upon the whole assessment by each corporation, person, or association, and in the other the county, or city and county taxes, due upon the assessment apportioned to each county, or city and county, by each corporation, person, or association. The two duplicates constitute the warrant for the comptroller to collect the state and county, and city and county, taxes levied upon such property assessed by the board, and the amount of the apportionment of the assessment to each county, and city and county, respectively. [In effect March 9, 1883.]

SECTION 3667. When the board of supervisors of each county, and city and county, to which the state Board of Equalization has apportioned the assessment of railways shall have fixed the rate of county, or city and county, taxation, the clerk of the board of supervisors must forthwith by mail, postage paid, transmit to the comptroller a statement of the rate of taxation levied by the board of supervisors for county, or city and county, taxation. If the clerk fails to transmit such statement, the comptroller must obtain the information as to such rate of taxation from other sources. On or before the fourth Monday of October the comptroller must compute and enter in separate money columns in the "Duplicate Record of Apportionment of Railway Assessments" the respective sums, in dollars and cents, rejecting fractions of a cent, to be paid by the corporation, person, or association liable therefor as the state tax upon the total amount of the assessment, and the county, or city and county, tax upon the apportionment of the assessment to each county, and city and county, or the property

The first count then averred that within ten days after the third Monday in August, 1887, the state Board of Equalization apportioned the total assessment of the franchise, road-

---

assessed to such corporation, person, or association named in said duplicate record. [In effect March 9, 1883.]

SECTION 3668. Within ten days after the fourth Monday in October, the comptroller must publish a notice for two weeks in one daily newspaper of general circulation at the state capital, and in two daily newpapers of general circulation published in the city of San Francisco, specifying:

1. That he has received from the state Board of Equalization the "Duplicate Record of Assessments of Railways" and the "Duplicate Record of Apportionment of Railway Assessments;"

2. That the taxes are now payable and will be delinquent on the last Monday in December next, at six o'clock P.M., and that unless paid to the state treasurer at the capitol prior thereto, five per cent will be added to the amount thereof. On the last Monday in December of each year, at six o'clock P.M., all of unpaid taxes are delinquent, and thereafter there must be collected by the state treasurer or other proper officer an addition of five per centum, which sum when collected must be set aside by the treasurer, as a fund with which to pay the contingent expenses of actions against any delinquents, the said expenses to be audited by the board of examiners. When any taxes are paid to the state treasurer by order of the comptroller, upon assessments made and apportioned by the state Board of Equalization, the comptroller must forthwith notify the auditor and treasurer respectively of each county, and city and county, that such taxes have been paid, and of the amount thereof to which each county and city and county interested is entitled. The State's portion of the taxes must be distributed by the treasurer to each fund entitled thereto, and the portion belonging to the counties, and cities and counties, must be placed in a fund, to be called "Railway Tax Fund," to the credit of each county, and city, and county entitled thereto. When any taxes are placed in the "Railway Tax Fund" to the credit of a county, or city and county, the comptroller, at the next settlement with the comptroller by the treasurer of such county, or city and county, must draw and deliver to such treasurer, his warrant upon the state treasurer for the amount in the fund to the credit of such county, or city and county. [In effect March 9, 1883.]

SECTION 3669. Each corporation, person, or association assessed by the state Board of Equalization must pay to the state treasurer, upon the order of the comptroller, as other moneys are required to be paid into the treasury, the state and county, and city and county, taxes each year levied upon the property so assessed to it or him by said board. Any corporation, person, or association, dissatisfied with the assessment made by the board, upon the payment of the taxes due upon the assessment complained of, and the five per cent added, if to be added, on or before the first Monday in February, and the filing of notice with the comptroller of an intention to

way, roadbed, rails and rolling stock of defendant to the counties in the State in which the railway was located, in proportion to the number of miles of railway laid in such

begin an action, may, not later than the first Monday of February, bring an action against the state treasurer for the recovery of the amount of taxes and percentage so paid to the treasurer, or any part thereof, and in the complaint may allege any fact tending to show the illegality of the tax, or of the assessment upon which the taxes are levied, in whole or in part. A copy of the complaint and of the summons must be served upon the treasurer within ten days after the complaint has been filed, and the treasurer has thirty days within which to demur or answer. At the time the treasurer demurs or answers he may demand that the action be tried in the Superior Court of the county of Sacramento. The attorney general must defend the action. The provisions of the Code of Civil Procedure relating to pleadings, proofs, trials, and appeals are applicable to the proceedings herein provided for. If the final judgment be against the treasurer, upon presentation of a certified copy of such judgment to the comptroller, he shall draw his warrant upon the state treasurer, who must pay to the plaintiff the amount of the taxes so declared to have been illegally collected, and the cost of such action, audited by the board of examiners, must be paid out of any money in the general fund of the treasury, which is hereby appropriated, and the comptroller may demand and receive from the county, or city and county, interested the proportion of such costs, or may deduct such proportion from any money then or to become due to said county, or city and county. Such action must be begun on or before the first Monday in February of the year succeeding the year in which the taxes were levied, and a failure to begin such action is deemed a waiver of the rights of action. [In effect March 9, 1883.]

SECTION 3670. After the first Monday of February of each year, the comptroller must begin an action in the proper court, in the name of the people of the State of California, to collect the delinquent taxes upon the property assessed by the state Board of Equalization; such suit must be for the taxes due the State, and all the counties, and cities and counties, upon property assessed by the Board of Equalization, and appearing delinquent upon the "Duplicate Record of Apportionment of Railway Assessments."

The demands for state and county, and city and county taxes, may be united in one action. In such action a complaint in the following form is sufficient:

[ Title of Court.]

THE PEOPLE OF THE STATE OF CALIFORNIA

*vs.*

(NAMING THE DEFENDANT).

Plaintiff avers that on the    day of    , in the year (naming the year), the state Board of Equalization assessed the franchise, roadway,

counties; and the amounts of the total assessment so apportioned by the board to those counties, and the number of miles of defendant's railway laid in said counties, were specifically set forth.

---

roadbed, rails, and rolling stock of the defendant at the sum of (naming it) dollars. That the board apportioned the said assessment as follows: To the county of (naming it) the sum of (naming it) dollars (and so on naming each county).

That the defendant is indebted to plaintiff for state and county taxes for the year eighteen          , in the following sums: For state taxes, in the sum of (naming it) dollars; for county taxes of the county of (naming it), in the sum of (naming it) dollars, etc., with five per cent added for non-payment of taxes. Plaintiff demands payment for said several sums and prays that an attachment may issue in form as prescribed in section 540 of the Code of Civil Procedure.

(Signed by the comptroller or his attorney.)

On the filing of such complaint, the clerk must issue the writ of attachment prayed for, and such proceedings shall be had as under writs of attachment issued in civil actions; no bond nor affidavit previous to the issuing of the attachment is required. If in such action the plaintiff recover judgment, there shall be included in the judgment as counsel fees, and in case of judgment of taxes after suit brought but before judgment, the defendant must pay as counsel fees, such sum as the court may determine to be reasonable and just. Payment of the taxes or the amount of the judgment in the case must be made to the state treasurer. In such actions the duplicate record of assessments of railways and the duplicate record of apportionment of railway assessments, or a copy of them, certified by the comptroller, showing unpaid taxes against any corporation, person, or association for property assessed by the state Board of Equalization, is *prima facie* evidence of the assessment, the property assessed, the delinquency, the amount of the taxes due and unpaid to the State and counties, or cities and counties therein named, and that the corporation, person, or association is indebted to the people of the State of California, in the amount of taxes, state and county, and city and county, therein appearing unpaid, and that all the forms of law in relation to the assessment and levy of such taxes have been complied with. [In effect March 9, 1883.]

SECTION 3671. The assessment made by the county assessor, and that of the state Board of Equalization, as apportioned by the board of supervisors to each city, town, township, school, road, or other district in their respective counties, or cities and counties, shall be the only basis of taxation for the county, or any subdivision thereof, except incorporated cities and towns, and may also be taken as such basis in incorporated cities and towns when the proper authorities may so elect. All taxes upon townships, road, school, or other local districts shall be collected in the same manner as county taxes. [In effect March 9, 1883.]

The count then proceeded as follows :

"V. That within ten days after the third Monday in August, 1887, said state. Board of Equalization did transmit to each of the county auditors of said counties a statement showing the length of the main track of defendant's railway within the counties of said auditors respectively, with a description of the whole of defendant's railway track within the counties of said auditors respectively, including the right of way sufficient for identification, the assessed value per mile of the same, as fixed by said *pro rata* distribution per mile of the said assessed value of the whole franchise, roadway, roadbed, rails and rolling stock of defendant's railway in said State, and the amount apportioned to the counties of said auditors respectively. . . .

"VI. That thereafter, and prior to the first Monday in October, 1887, the county auditor of each of said counties did enter said statement so transmitted to him upon the assessment roll of his county, and did enter upon said assessment roll of his county the said amount of said assessment apportioned by said state Board of Equalization to his county in the column of the assessment roll of his county which showed the total value of all property of his county for taxation. . . .

"VII. That thereafter, and on the first Monday of October, 1887, the board of supervisors of each of said counties did levy the state tax of said State of California according to the rate theretofore fixed for such state tax for the fiscal year ending June 30, 1888, by said state Board of Equalization, upon the taxable property in its county, including the property of defendant assessed and apportioned to its county as aforesaid, and the taxes so levied in all of said counties for the purposes of state taxation upon said property of defendant assessed and apportioned to said counties as aforesaid was the sum of $109,440.

"VIII. That upon the seventeenth day of September, 1887, said state Board of Equalization did fix the rate of state taxation for the fiscal year ending June 30, 1888, at the rate of $0.608 on each one hundred dollars.

"IX. That defendant has never at any time paid said state tax, amounting to said sum of $109,440, nor any part thereof. That said state tax became and was delinquent on the last Monday in December, 1887, at six o'clock P.M., and upon and at the time of and by reason of such delinquency five per cent of said state tax, to wit, the sum of $5472, was, by the comptroller of said State, added to said state tax, and no part of said $5472, so added for delinquency has ever been paid by defendant.

"X. That prior to the third Monday of October, 1887, the said state Board of Equalization did prepare and transmit to the comptroller of said State a duplicate record of assessment of, railways, and a duplicate record of apportionment of railway assessments for the fiscal year ending June 30, 1888, both certified by the chairman and clerk of said state Board of Equalization, and which said duplicate records included the said assessment of defendant's said property, and the said apportionment of the assessment of defendant's property to the said counties.

"Before the fourth Monday of October, 1887, said comptroller did compute at the rates of taxation fixed and levied as aforesaid, and enter in separate money columns in the said duplicate record of apportionment of railway assessments, the respective sums, in dollars and cents, to be paid by the defendant as the state tax upon the total amount of said assessment, and as the county tax upon the apportionment of said assessment to each county, and city and county, of the property assessed to defendant named in said duplicate record. That within ten days after the fourth Monday in October, 1887, said comptroller did publish for two weeks in one daily newspaper of general circulation published at the state capital of said State, and in two daily newspapers of general circulation published in the city and county of San Francisco in said State, a notice that he had received from said state Board of Equalization said duplicate record of assessments of railways, and said duplicate record of apportionment of railway assessments, and that the said taxes were then due and payable and would become delinquent on the last Monday in December,

1887, at 6 o'clock P.M., and that unless paid to the state treasurer at the capital prior thereto, five per cent would be added to the amount thereof.

"That a reasonable compensation for legal services by Langhorne & Miller, attorneys for plaintiff, in the institution and prosecution of this cause of action, is a sum equal to ten per cent of the tax in this cause of action alleged to be delinquent."

Then followed eighteen counts for the county taxes in the several counties, all averring in detail compliance with the law in relation thereto.

Defendant demurred to the complaint, the demurrer was overruled, and defendant answered, setting up various defences, one of which was that the franchise assessed to defendant by the state Board of Equalization was derived by defendant from the government of the United States through certain acts of Congress, and that the same were used by defendant as one of the instrumentalities of the Federal government, and, hence, was not taxable by the State; that the assessment of this franchise was so blended with the whole assessment as not to be separable therefrom; and that the whole assessment was therefore void.

The plaintiff put in evidence the "Duplicate Record of Assessments of Railways by the state Board of Equalization for 1887," and the "Duplicate Record of Apportionment of Railway Assessments for 1887," filed in the office of the comptroller of the State of California on the 11th of October, 1887. These were admitted subject to defendant's objection. The duplicate record of the assessments of railways stated that "the state Board of Equalization being in session on this, the thirteenth day of August, 1887, all the members being present, and having under consideration the assessment of the franchise, roadway, roadbed, rails and rolling stock of the Central Pacific Railroad Company, within the State, for the year 1887, and it appearing to this board that said company, on the first Monday in March, in the year 1887, at 12 o'clock, meridian, of that day, owned, and still owns, 719.50 miles of railroad within this State, which at said time and day

in March was, and still is, operated in more than one county; being the entire railway of said company within this State, and which, with the right of way for the same, is described as follows:" [Here follows description of line of roadway, roadbed, rails and right of way.] "And it appearing that the actual value of the franchise, roadway, roadbed, rails and rolling stock of said company, within this State, at the said date and time in March, was, and still is, the sum of eighteen millions of dollars: Therefore, it is hereby ordered that the said franchise, roadway, roadbed, rails and rolling stock, for the year 1887, be and the same are hereby assessed to the said Central Pacific Railroad Company at the sum of eighteen million dollars."

The duplicate record of apportionment of railway assessments, under date of August 22, 1887, stated: "The state Board of Equalization met this day. All the members present. The board this day apportioned the total assessment of the franchise, roadway, roadbed, rails and rolling stock of each railroad assessed by it on the 13th day of August, 1887, for the year 1887, to the counties and the city and county of San Francisco in proportion to the number of miles of railway laid in each county, and in the city and county of San Francisco, which apportionment is set out in the following table. The apportionment is based upon the proportion the number of miles in each county of a railway bears to the total number of miles of such railway laid in the State."

The annexed table gave the name of the corporation to which each railway was assessed and the name of each railway assessed, in this instance as the "Central Pacific Railroad Company ;" the names of the counties and city and county, to which the assessment was apportioned; the total number of miles of road in the State; the number of miles in each county and city and county; the value per mile; the total assessment of the franchise, roadway, roadbed, rails and rolling stock of each railway assessed; the amount apportioned to each county, and city and county, for purposes of county and city and county taxation; rate of taxation for each county, and city and county, levied by the board of supervisors; amount of

state taxes at the state rate; and amount due of county, and city and county, taxes upon the assessment as apportioned.

It was admitted that the apportionment was made as the Political Code required it to be made, and that the mileage for each county was correctly stated.

Plaintiff then proved, under objection, that the taxes sued for had not been paid, or any portion thereof. Evidence was also introduced in regard to the value of services of counsel.

Defendant called as a witness C. M. Coglan, clerk of the Board of Equalization, and identified the original minutes of the proceedings of the board relating to the assessment of the property of the Central Pacific Railroad Company for the year 1888, under date of August 17, 1888. It appeared therefrom that the attorney general recommended to the board that the franchises of the Central Pacific and Southern Pacific companies, derived from the State, be assessed, and that the valuation thereof be stated, separately in the record of assessments; that the board assess the moles, bridges and culverts of each road separately, and in respect of certain railroad companies declare that the steamers used in operating those roads were not assessed; whereupon the board proceeded to make such assessment, and ordered that the franchise of the Central Pacific Railroad Company, derived from the State of California, be assessed at $1,250,000, and that the franchise of the Southern Pacific Railroad Company, derived from the State of California, be assessed at $1,000,000; that the moles, culverts, bridges and wharves upon which the tracks of the Central Pacific are laid be assessed at $1,000,000; that the moles, culverts, bridges and wharves upon which the tracks of the Southern Pacific are laid be assessed at $400,000. The original record of the assessment of the Central Pacific Railroad Company, made by the board for the year 1888 was offered in evidence, and was to the effect that the board assessed the franchise derived from the State of California, the roadway, roadbed and rolling stock of said company within said State, at the total sum of $15,000,000.

On the cross-examination of Mr. Coglan, plaintiff offered and the court admitted, in evidence, under defendant's objec-

tion, the verified statements furnished by defendant to the state Board of Equalization during the years 1887 and 1888, which were marked plaintiff's Exhibits 4 and 6. Exhibit four was the return made by the Central Pacific Railroad Company for 1888, which read thus:

"The Central Pacific Railroad Company answers the questions propounded by the board as follows: And makes the following statement in relation to its property subject to taxation in the State of California, owned by it for the year ending on the first Monday in March, 1888, and of all property used in operating its railway during such year:

"The length of railway owned and operated as a system in and out of the State is 1344.14 miles.

"Length of track, sidings and double track reduced to single track is ——; out of the State, 597 miles.; in the State, 747.14 miles.

"The value of the franchise derived from the
    State within this State................ $25 00
"The value of the entire roadway, roadbed,
    rolling stock and rails within this State is  9,376,607 00
                                       $9,376,632 00 "

This was followed by a list of the mileage of the road in California in each of the counties through which it ran, and schedules of the rolling stock; the earnings and expenses of the road as a system in and out of the State; of the operating expenses; and of the earnings and expenses within the State. The return was duly sworn to.

Exhibit six was the return of the company for the year 1887. This opened with the same statement as the other, and after giving the length of the railway owned and operated as a system and the length of track, single and double, out of and in the State, continued: "The value of the franchise and entire roadway, roadbed and rails within this State is $12,273,785.00." The usual lists and schedules were attached.

Defendant then called as a witness one Morehouse, a member of the state Board of Equalization, whose evidence tended

to show that the assessment for 1887 was intended by him to and did include defendant's Federal franchise, but that he could not say that the value of the Federal franchise operated on the minds of the other members of the board in making up the items of the valuation. Defendant offered to prove by Morehouse that at every session from 1883 and prior to 1888, the board, in making its assessment of the valuation of the property of the Central Pacific Railroad Company, included in its total estimate the value of the Federal franchise held by that company, by virtue of the acts of Congress referred to, and that the valuation of the Federal franchise was blended into the general assessment of that company in such a manner as to be indistinguishable from it and not capable of separation. This was objected to as incompetent, irrelevant and immaterial, the objection sustained by the court, and exception saved.

E. W. Maslin, secretary of the state Board of Equalization from April, 1880, to March, 1891, who was present at the board meetings and kept the record of its proceedings, was called as a witness by defendant, and testified that from his acquaintance with the history of the assessment of the road since 1880, his relation to it with respect of the franchise and personal property, his conversation with many members through those years, the knowledge he had of how two members arrived at their conclusions and the knowledge that he thought he had as to how three members arrived at their conclusions, he thought he could state what elements of value were considered by the board in making their estimate for the total values for 1887. Thereupon defendant asked witness the following questions:

"Q. From the various sources of knowledge which you have enumerated, please state to the court what elements were taken into consideration by the state Board of Equalization in making the assessment of this company for the year 1887.

"Q. Did you hear any conversation between the members of the state Board of Equalization during the meeting when the assessment of this company was made for the year 1887, with reference to the elements that they proposed to and did include in the assessment?

" Q. At the time that the assessment of 1887 was made by the state Board of Equalization upon the property of the Central Pacific Railroad Company, what was said and done at the meeting of the state Board of Equalization on that day in your presence ? "

To each of these questions plaintiff interposed objections, which were sustained by the court, and defendant excepted.

Defendant then made the following offer:

" Now, in view of the ruling of the court on this subject, we now offer to prove by this witness that from the time of the organization of the state Board of Equalization in 1880 down to and including the year 1887, that board had every year considered the value of the Federal franchise — that is, the franchise derived from the United States by the acts of Congress of the government of the United States, belonging to and owned by the Central Pacific Railroad Company, as an element of value in assessing the total value of the property of that railroad company ; and that in 1888, in consequence of the decision of the Supreme Court of the United States upon the subject, the state Board of Equalization for the first time ceased to consider this Federal franchise as an element of value, and hence reduced their valuation by the sum of three million dollars on the Central Pacific Railroad Company's property."

This offer was disallowed by the court, and defendant excepted.

Plaintiff in rebuttal called C. E. Wilcoxen and J. P. Dunn, who were members of the board and participated in making the assessment of 1887, and they testified that the Federal franchise was not included in the assessment for that year. On the cross-examination of Mr. Wilcoxen an effort was made to introduce testimony that he had given before a committee of the general assembly of California in 1889, which the court excluded, except so far as it related to the year 1887.

The statement on motion for new trial then continued :

" In its written opinion, upon which the findings were based, the court after determining as a fact, from a preponderance of the evidence before it, that the Federal franchise of defendant was not assessed or included in the assessment of

the property of defendant by the state Board of Equalization, for the year 1887, uses the following language :

" ' But if the parol evidence offered did not weigh in plaintiff's favor, and if by a preponderance of such evidence defendants could have shown that the State intended to and did include a Federal franchise in the assessment, I think the court would have to disregard it as incompetent. The effect of such parol evidence would be to contradict the record, which cannot be done.

" ' The best and only evidence of the acts and intentions of deliberative bodies must be drawn from the record of its intentions. . . . From both standpoints of fact and of law, the findings must be that a Federal franchise was not included in these assessments.' "

On February 3 the Superior Court made and filed its written findings of fact and conclusions of law. The findings of fact included the following :

"XXX. That on the 13th day of August, 1887, the state Board of Equalization, of the State of California, did, for the purposes of taxation for the fiscal year 1887 assess as a unit, and not separately, the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad, then being and situate within the State, at the sum and value mentioned in the amended complaint, and did then and there enter said assessment upon its minutes, and in its record of assessments. That such assessment is the one upon which the several taxes mentioned in the complaint herein are based, and no other assessment than the one aforesaid was ever made by said Board of Equalization or other assessor of said property of the defendant for said fiscal year. That said state Board of Equalization did at the time and in the manner alleged in the amended complaint apportion said assessment and transmit such assessment and the apportionment to the county and city and county auditors, and said assessment and the apportionment thereof were entered upon the assessment rolls of said counties and said cities and counties as alleged in said amended complaint, as hereinbefore found.

"XXXI. That the said Board of Equalization, in making

said assessment, did assess the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad, at their full cash value, without deducting therefrom the value of the mortgage, or any part thereof, or the value of said bonds issued under said acts of Congress, given and existing thereon, as aforesaid, to secure the indebtedness of said company to the holders of said bonds, and, in making said assessment, said board did not deem nor treat said mortgage or bonds as an interest in said property, but it assessed the whole value of said property as assessed to defendant in the same manner it would have done had there been no mortgage thereon. At the time said assessment and apportionment were made as aforesaid by said state Board of Equalization the assessment books or rolls for the said fiscal year had been completed and were in existence, and the assessment and valuation of defendant's property for the purposes of taxation for said fiscal year had been ascertained and fixed as provided by law, and said board, in making said valuation and apportionment, did exercise all necessary powers relative to the equalization of values for the purposes of taxation."

"XXXIII. Said state Board of Equalization, in making said assessment of defendant's roadway, did not include in the valuation of said roadway the value of any fences erected upon the land of coterminous proprietors, and did not value said roadway at a greater value than the value of other property similarly situated and greater than its actual cash value, and did not blend in said assessment the value of any fences. That said board, in making its said assessment and valuation therefor, did not adopt a system of valuation which operated unequally, or which was intended to or which did in any manner violate the rule prescribed in section 10 of article 13 of the state constitution, and said board, in making its said assessment and valuation therefor, did not value the rolling stock of defendant at sixty (60) or any other per cent above its actual value, and did not value nor assess defendant's franchise in excess of its actual value.

"XXXIV. That in making said assessment and valuation therefor said state Board of Equalization did not include the

value of or assess any steamboats or boats, nor blend the value or assessment of any steamboats or boats, with the value of or assessment of defendant's roadway, rails, roadbed and rolling stock.

"XXXV. That in making its assessment and valuation therefor of defendant's franchise said state Board of Equalization did not include, assess or value any franchise or corporate power held or exercised by defendant under the acts of Congress hereinbefore mentioned, or under any act of Congress whatever. And said board, in making said assessment and valuation therefor, upon defendant's franchise, roadbed, roadway, rails and rolling stock, for purposes of taxation for the fiscal year 1887, did not include in its said assessment and valuation therefor any Federal franchise, then possessed by defendant, nor any franchise or thing whatsoever, which said board could not legally include in such assessment of valuation. That the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad were valued and assessed by said state Board of Equalization, for purposes of taxation for the fiscal year 1887, at their actual value, and in proportion to their values respectively."

The conclusions of law were that plaintiff was entitled to recover the sums claimed, with five per cent penalty, interest and counsel fees, the amounts being stated, and costs.

Judgment was rendered in plaintiff's favor accordingly.

On the 19th of June following, the statement, on motion for new trial, was approved and filed as part of the record, including an assignment and specification of errors. The defendant's motion for a new trial was overruled, and defendant appealed to the Supreme Court of the State from the judgment and from the order denying the motion for new trial. January 6, 1895, the Supreme Court rendered judgment, directing the court below to modify its judgment by striking therefrom the amount allowed for interest prior to the entry thereof, and also certain counsel fees, and that, as so modified, the judgment and order denying a new trial should stand affirmed. The opinion is reported in *People* v. *Central Pacific Railroad*, 105 California, 576.

*Mr. J. Hubley Ashton* (with whom was *Mr. Charles H. Tweed* on the brief,) for plaintiff in error.

*Mr. J. P. Langhorne* and *Mr. J. H. Miller*, (with whom was *Mr. W. F. Fitzgerald*, attorney general of the State of California, on the brief,) for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The assessment of the state Board of Equalization is not attacked on the ground of fraud, but it is contended that the value of the Federal franchise or franchises possessed by plaintiff in error was included therein, and that as the assessment embraced all the property assessed as a unit, it was thereby wholly invalidated. *Santa Clara County* v. *Southern Pacific Railroad*, 118 U. S. 394; *California* v. *Central Pacific Railroad*, 127 U. S. 1.

By section 1 of article XIII of the constitution of California, it is provided that "all property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law. The word 'property' as used in this article and section is hereby declared to include moneys, credits, bonds, stocks, dues, franchises and all other matters and things real, personal and mixed, capable of private ownership;" and by section 10 that "the franchise, roadway, roadbed, rails and rolling stock of all railroads operated in more than one county in this State shall be assessed by the state Board of Equalization, at their actual value;" and the Political Code provided that this must be, and the mode in which it should be, done.

Railway corporations were required to furnish the Board of Equalization, before it acted, and as of the first Monday of March in each year, a statement signed and sworn to by one of their officers, showing in detail the whole number of miles of railway in the State, and, when the line was partly out of the State, the whole number of miles within and without, owned or operated by each corporation, and the value thereof; the value of the roadway, roadbed and rails of the whole, and

the value of the same within the State; the width of the right of way; the rolling stock and value; the gross earnings of the entire road and of the road within the State; the net income; the capital stock authorized and paid in; the number of shares authorized and issued, etc.

This verified statement for 1887 was made by plaintiff in error in due time, and purported to be a " statement in relation to its property subject to taxation in the State of California owned by it for the year ending on the first Monday in March, 1887, and of all property used in operating its railway during such year." And it was therein set forth, among other things: " The value of the franchise and entire roadway, roadbed and rails within this State is $12,273,785.00." The Board of Equalization determined " that the actual value of the franchise, roadway, roadbed, rails and rolling stock of said company, within this State, at the said date and time in March, was and still is the sum of eighteen million dollars," and thereupon assessed " the said franchise, roadway, roadbed, rails and rolling stock for the year 1887" at that sum.

By section 3670 of the Political Code, the duplicate record of assessments of railways, and the duplicate record of apportionment of railway assessments, or copies thereof, were made *prima facie* evidence of the assessment, and that the forms of law in relation to the assessment and levy of such taxes had been complied with, and these were put in evidence.

Under this state of facts, the presumption was that the franchise thus included by plaintiff in error in its return and by the board in its assessment was a franchise which was not exempt under the laws of the United States, and that the board had acted upon property within its jurisdiction rather than upon property which it had no power to include in the assessment. Indeed, as the Supreme Court points out, when plaintiff in error included the franchise in its statement, if there were two franchises, one of which could be assessed and the other could not, plaintiff in error ought not to be permitted to say that the one which was not capable of assessment was intended by it to be or was included therein. *People* v. *Central Pacific Railroad,* 105 California, 576, 592. And the

court cited *San Francisco* v. *Flood*, 64 California, 504; *Lake County* v. *Sulphur Bank Quicksilver Mining Co.*, 68 California, 14, and *Dear* v. *Varnum*, 80 California, 86, which rule that a party who furnishes a list of property for taxation is estopped from questioning the sufficiency of the description so furnished in an action to collect the taxes. Undoubtedly if the Board of Equalization had included what it had no authority to assess, the company might seek the remedies given under the law to correct the assessment so far as such property was concerned, or recover back the tax thereon, or, if those remedies were not held exclusive, might defend against the attempt to enforce it. But where the property mentioned in the description could be assessed and the assessment followed the return, as it did here, the company ought, at least, to be held estopped from saying that the description was ambiguous.

It is said that plaintiff in error should not be bound by this statement because it was on printed blanks prepared by the board; but when plaintiff in error filled out and swore to the statement of its property "as being subject to taxation," and the blank form called on plaintiff in error to give a statement of the value of its franchise within the State for the purpose of assessment and taxation, if it had intended to claim that its state and Federal franchises were so merged as to render the former not subject to taxation, or that it had no franchise subject to taxation, it was its duty to so indicate in making the return. Nothing in the law and nothing in the blank form could have compelled it to make a statement contrary to the facts.

Plaintiff in error attempted to rebut the case made by introducing evidence which it claimed tended to show that the franchise assessed covered franchises derived from the United States as well as from the State, but the findings of fact of the trial court were to the contrary, and there being a conflict of evidence on the point, the Supreme Court treated the findings as conclusive in accordance with the well-settled rule on the subject in that jurisdiction. In *Reay* v. *Butler*, 95 California, 206, 214, it was said: "It has been held here in

more than a hundred cases, commencing with *Payne* v. *Jacobs*, 1 California, 39, in the first published book of reports of this court, and ending with *Dobinson* v. *McDonald*, 92 California, 33, in the last volume of said reports, that the finding of a jury or court as to a fact decided upon the weight of evidence will, not be reviewed by this court."

That rule is equally binding on us. *Republican River Bridge Co.* v. *Kansas Pacific Railway*, 92 U. S. 315; *Dower* v. *Richards*, 151 U. S. 658.

It was argued in the Supreme Court of California, as it has been here, that because the trial judge, after having determined as a fact from the preponderance of the evidence before him that the Federal ·franchise was not assessed, stated that he thought that if the parol evidence offered had not weighed in plaintiff's favor, and that if by a preponderance of such evidence defendants could have shown that the board intended to and did include a Federal franchise in the assessment, the court would have to disregard it as incompetent, because the effect would be to contradict the record, therefore the evidence had been disregarded by the court in making its decision, and that the rule in respect of the conclusiveness of a determination of facts on a conflict of evidence did not apply. We entirely concur with the disposition of this suggestion by the Supreme Court, which said: ".It clearly appears, however, that the court did not disregard the evidence, but that, after determining as a fact from the preponderance of evidence before it that the Federal franchise had not been assessed, it stated that if the preponderance of evidence had been otherwise, it would have held as a matter of law that the assessment must be tested by its own language. The fact that a court, after giving its decision upon an issue, gives its opinion upon the manner in which it would have decided the issue under other circumstances, does not constitute an error to be reviewed in this court."

Counsel for plaintiff in error also urge that inasmuch as it appeared in the proceedings to assess for 1888 that the board placed " the franchise of the Central Pacific company derived from the State of California " at $1,250,000, and then assessed

" the franchise derived from the State of California, the road-way, roadbed and rolling stock of said company within said State at the total sum of $15,000,000," it should be inferred from the difference in the language used in the assessment of 1887, and the difference in the total amount, that the franchise then assessed included the Federal franchise. But it also appeared that the return of the company for 1888 in respect of this matter was as follows:

"The value of the franchise derived from the
     State within this State..................     $25 00
"The value of the entire roadway, roadbed,
     rolling stock and rails within this State is.. 9,376,607 00
                                   $9,376,632 00 "

And we think that neither the difference in valuation nor the difference in the mode of statement has a material bearing on the assessment of 1887. The proceedings in 1888 showed greater care on the part of the company in making the return and on the part of the board in making the assessment, and possibly if plaintiff in error had been equally careful in relation to the assessment in 1887, it might have resulted that the valuation would have been less, although it does not follow that the reduction in 1888 might not be attributed to a change of financial conditions.

After all, these are considerations which were presented to the trial judge, in connection with all the evidence, and they have been disposed of adversely to the company.

Exceptions were saved to the action of the trial court in respect of the exclusion of certain evidence, but we are unable to find in these rulings or in the decision of the Supreme Court thereon the denial of any title, right, privilege or immunity specially set up or claimed under the Constitution or laws of the United States.

The rulings passed on by the Supreme Court, and which we must assume were all that were called to its attention, relate to the cross-examination of the witness Wilcoxen, as to statements previously made by him, which the Superior Court confined to the assessment for 1887, in respect of which he had

been examined in chief. The Supreme Court held that, under the circumstances disclosed by the record, the Superior Court did not err in this particular.

And also to the exclusion of the evidence of Maslin as to the conversations of members of the board, in making the assessment, in relation thereto. The Supreme Court held as to this that "the intention of the board or of any of its members, or the signification to be given to the term 'franchise,' as used in the assessment, could not be shown in this manner, and the evidence could not be used for impeaching purposes, unless the members of the board had been previously questioned thereon."

The correctness of these rulings commends itself to us, but it is enough to say that it is impossible to predicate error raising a Federal question as to these or any of the rulings on evidence referred to by counsel.

Clearly no such error was committed in the rejection of the general offers of proof if we should treat them as open to consideration notwithstanding the apparent abandonment of the exceptions in that regard in the Supreme Court. The issue was upon the assessment for the year 1887. The decision in *California* v. *Pacific Railroad Company*, 127 U. S. 1, was announced April 30, 1888, but the last of the judgments of the Circuit Court therein considered and affirmed was rendered July 15, 1886. And the action of the board in years prior to 1887, as sought to be shown, was not necessarily relevant or material. Offers of proof must be offers of relevant proof, specific, not so broad as to embrace irrelevant and immaterial matter, and made in good faith. The exercise of the discretion of the trial court in rejecting these offers cannot properly be reviewed by us.

The errors assigned as to the non-deduction of outstanding mortgages from the valuation of the property are expressly waived, though it is assigned for error in the brief that the court erred in not holding that, as the state franchise was subject to the lien of a mortgage to the United States, the assessment was invalid because in effect taxing the interest of the United States in that franchise created by the mortgage.

As to this, no such question was raised or passed on in the state court; and, moreover, the objection is without merit, on principle and authority, on grounds hereafter stated.

We are thus brought to the consideration of the real question in the case, presented in various aspects and argued with much ability by counsel for plaintiff in error, namely, that the company's franchises are one and inseparable, constituting an indivisible unit, which cannot be subjected to taxation by the State of California because that would be necessarily to subject the Federal franchise to taxation.

The argument is that the franchise of railroads authorized by the state constitution and the provisions of the Political Code to be assessed is nothing but the right to operate the railroad and charge and take tolls thereon; that the right of the Central Pacific Railroad Company to construct, maintain and operate its railroad in California was conferred upon that company by, and derived by it from, the United States; and that the right is a single right, though granted also by the State.

The company is a corporation of California, made up of two California corporations consolidated by articles of association entered into under the laws of California, and recognized as a California corporation by the acts of Congress through which it obtained Federal assistance and Federal franchises, subsequently to its incorporation in 1861, act of July 1, 1862, c. 120, 12 Stat. 489; act of July 2, 1864, c. 216, 13 Stat. 356; act of March 3, 1865, c. 88, 13 Stat. 504; act of May 7, 1878, c. 96, 20 Stat. 56; and never otherwise regarded in the legislation of the State. Indeed, by the act of April 4, 1864, Stat. Cal. 1863–1864, c. 417, passed to "enable the said company more fully and completely to comply with and perform the provisions and conditions of said act of Congress," of July 1, 1862, California authorized the company to construct, maintain and operate the road and telegraph in the territory lying east of the State, with the usual incidental rights, privileges and powers, also vesting in the company the rights, franchises and powers granted by Congress, with the express reservation that the company should be "subject to all the

laws of this State concerning railroad and telegraph lines, except that messages and property of the United States, of this State, and of the said company, shall have priority of transportation and transmission over said line of railroad and telegraph." *Sinking Fund cases*, 99 U. S. 700, 754. Severance of the allegiance of the corporation to the State that created it, and deprivation or transfer of the powers and privileges conferred by the State, were not the object of the grant by the United States, nor the consequence of the acceptance of that grant by the corporation as thereto authorized by the State. *Pennsylvania Railroad* v. *St. Louis, Alton &c. Railroad*, 118 U. S. 290, 296. But it was not contended at the bar that the company ever became a corporation of the United States, or that it is other than a state corporation.

Even in respect of railway corporations created by act of Congress the claim of an exemption of their property from state taxation has been repeatedly denied. This was so ruled in *Railroad Company* v. *Peniston*, 18 Wall. 5, 30, 36, and Mr. Justice Strong said:

"It cannot be that a state tax which remotely affects the efficient exercise of a Federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the States all power to tax persons or property. Every tax levied by a State withdraws from the reach of Federal taxation a portion of the property from which it is taken, and to that extent diminishes the subject upon which Federal taxes may be laid. The States are, and they must ever be, coexistent with the National Government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the States, or prevent their efficient exercise. . . .

"It is, therefore, manifest that exemption of Federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax;

that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal powers.

" In this case the tax is laid upon the property of the railroad company precisely as was the tax complained of in *Thomson* v. *Union Pacific.* It is not imposed upon the franchises or the right of the company to exist and perform the functions for which it was brought into being. Nor is it laid upon any act which the company has been authorized to do. It is not the transmission of dispatches, nor the transportation of United States mails, or troops, or munitions of war that is taxed, but it is exclusively the real and personal property of this agent, taxed in common with all other property of the State of a similiar character. It is impossible to maintain that this is an interference with the exercise of any power belonging to the General Government, and if it is not, it is prohibited by no constitutional implication."

In *Thomson* v. *Pacific Railroad*, 9 Wall. 579, 590, the Union Pacific Railway Company, Eastern Division, a corporation created by the legislature of Kansas, received government aid in bonds and land, and, thus aided, constructed its road to become one link in the transcontinental line known as the Union Pacific system, in accordance with the same acts of Congress relating to plaintiff in error, and conferring the same functions and privileges. The State of Kansas having subsequently taxed the roadbed, rolling stock and certain personal property of the corporation, its stockholders sought to enjoin the collection of the tax on the ground that the property was mortgaged to the United States and that it was bound under the Congressional grant to perform certain duties and ultimately pay five per cent of its net earnings to the United States, and that state taxation would retard and burden it in the discharge of its obligations to the general government. But the contention was overruled, and Mr. Chief Justice Chase said :

" But we are not aware of any case.in which the real estate or other property of a corporation not organized under an act of Congress, has been held to be exempt, in the absence of express legislation to that effect, to just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the government.

" It is true that some of the reasoning in the case of *McCulloch* v. *Maryland* seems to favor the. broader doctrine. But the decision itself is limited to the case of the bank, as a corporation created by a law of the United States, and responsible, in the use of its franchises, to the government of the United States. .

" And even in respect to corporations organized under the legislation of Congress, we have already held, at this term, that the implied limitation upon state taxation, derived from the express permission to tax shares in the national banking associations, is to be so construed as not to embarrass the imposition or collection of state taxes to the extent of the permission fairly and liberally interpreted. *National Bank* v. *Commonwealth*, 8 Wall. 353.

" We do not think ourselves warranted, therefore, in extending the exemption established by the case of *McCulloch* v. *Maryland*, beyond its terms. We cannot apply it to the case of a corporation deriving its existence from state law, exercising its franchise under state law, and holding its property within state jurisdiction and under state protection.

" . . . No one questions that the power to tax all property, business and persons, within their respective limits, is original in the States and has never been surrendered. It cannot be so used, indeed, as to defeat or hinder the operations of the national government; but it will be safe to conclude, in general, in reference to persons and state corporations employed in government service, that when Congress has not interposed to protect their property from state taxation, such taxation is not obnoxious to that objection. *Lane County* v. *Oregon*, 7 Wall. 71, 77; *National Bank* v. *Commonwealth*, 8 Wall. 353. We perceive no limits to the principle of exemp-

tion which the complainants seek to establish.   It would remove from the reach of state taxation all the property of every agent of the government.   .   .   .

" The nature of the claims to exemption which would be set up, is well illustrated by that which is advanced in behalf of the complainants in the case before us.   The very ground of claim is in the bounties of the general government.   The. allegation is, that the government has advanced large sums to aid in the construction of the road; has contented itself with the security of a second mortgage; has made large grants of land upon no condition of benefit to itself, except that the company will perform certain services for full compensation, independently of those grants; and will admit the government to a very limited and wholly contingent interest in remote net income.   And because of these advances and these grants, and this fully compensated employment, it is claimed that this state corporation, owing its being to state law, and indebted for these benefits to the consent and active interposition of the state legislature, has a constitutional right to hold its property exempt from state taxation; and this without any legislation on the part of Congress which indicates that such exemption is deemed essential to the full performance of its obligations to the government."

In his dissenting opinion in *Railroad Co.* v. *Peniston*, 18 Wall. 5, 48, Mr. Justice Bradley distinguishes *Thomson* v. *Pacific Railroad* from that case thus: " That was a state corporation, deriving its origin from state laws, and subject to state regulations and responsibilities.   It would be subversive of all our ideas of the necessary independence of the national and state governments, acting in their respective spheres, for the general government to take the management, control, and regulation of state corporations out of the hands of the State to which they owe their existence, without its consent, or attempt to exonerate them from the performance of any duties, or the payment of any taxes or contributions, to which their position, as creatures of state legislation, renders them liable."

Both these cases were referred to with approval by Mr.

Justice Miller in *Western Union Telegraph Co.* v. *Massachusetts*, 125 U. S. 530, and by Mr. Justice Brewer in *Reagan* v. *Mercantile Trust Co.*, 154 U. S. 413, 416. In the latter case it was contended that, as the Texas and Pacific Railway was a corporation organized under the laws of the United States, it was not subject to the control of the State even as to rates of transportation wholly within the State. The argument was that the company received all its franchises from Congress; that among those franchises was the right to charge and collect tolls, and that the State had not the power, therefore, in any manner to limit or qualify such franchise. But that position was not sustained, and Mr. Justice Brewer, delivering the opinion, said "that, conceding to Congress the power to remove the corporation in all its operations from the control of the State, there is in the act creating the company nothing which indicates an intent on the part of Congress to so remove it, and there is nothing in the enforcement by the State of reasonable rates for transportation wholly within the State which will disable the corporation from discharging all the duties and exercising all the powers conferred by Congress."

Although the Central Pacific company is not a Federal corporation, it is nevertheless true that important franchises were conferred upon the company by Congress, including that of constructing a railroad from the Pacific Ocean to Ogden in the Territory of Utah. But as remarked in *California* v. *Central Pacific Railroad*, 127 U. S. 1, 38, 40, " this important grant, though in part collateral to, was independent of, that made to the company by the State of California, and has ever since been possessed and enjoyed." That case came up from the Circuit Court of the United States for the Northern District of California, and the Circuit Court found that the assessment made by the state Board of Equalization "included the full value of all franchises and corporate powers, held and exercised by the defendant;" and as it could not be denied that that embraced franchises conferred by the United States, it was held that the assessment was invalid, but it was not held nor intimated that if the Board of Equali-

zation had only included the state franchise, the same result would have followed.

Mr. Justice Bradley, delivering the opinion of the court, said:

"Assuming, then, that the Central Pacific Railroad Company has received the important franchises referred to by grant of the United States, the question arises whether they are legitimate subjects of taxation by the State. They were granted to the company for national purposes and to subserve national ends. It seems very clear that the State of California can neither take them away, nor destroy nor abridge them, nor cripple them by onerous burdens. Can it tax them? It may undoubtedly tax outside visible property of the company, situated within the State. That is a different thing.

"But may it tax franchises which are the grant of the United States? In our judgment, it cannot. What is a franchise? Under the English law Blackstone defines it as 'a royal privilege, or branch of the King's prerogative, subsisting in the hands of a subject.' 2 Bl. Com. 37. Generalized, and divested of the special form which it assumes under a monarchical government based on feudal traditions, a franchise is a right, privilege or power of public concern, which ought not to be exercised by private individuals at their mere will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest, and for the public security. Such rights and power must exist under every form of society. They are always educed by the laws and customs of the community. Under our system, their existence and disposal are under the control of the legislative department of the government, and they cannot be assumed or exercised without legislative authority. No private person can establish a public highway, or a public ferry, or railroad, or charge tolls for the use of the same, without authority from the legislature, direct or derived. These are franchises. No private person can take another's property, even for a public use, without such authority; which

is the same as to say, that the right of eminent domain can only be exercised by virtue of a legislative grant. This is a franchise. No. persons can make themselves a body corporate and politic without legislative authority. Corporate capacity is a franchise. The list might be continued indefinitely."

Mr. Justice Bradley then referred to *McCulloch* v. *Maryland, Osborn* v. *Bank of the United States,* and *Brown* v. *Maryland* to the proposition that a power given to a person or corporation by the United States cannot be subjected to taxation by a State, and added " that these views are not in conflict with the decisions of this court in *Thomson* v. *Pacific Railroad,* 9 Wall. 579, and *Railroad Company* v. *Peniston,* 18 Wall. 5. As explained in the opinion of the court in the latter case, the tax there was upon the property of the company and not upon its franchises or operations. 18 Wall. 35, 37."

Thus it was reaffirmed that the property of a corporation of the United States might be taxed, though its franchises, as for instance its corporate capacity and its power to transact its appropriate business and charge therefor, could not be. It may be regarded as firmly settled that although corporations may be agents of the United States, their property is not the property of the United States, but the property of the agents, and that a State may tax the property of the agents, subject to the limitations pointed out in *Railroad Co.* v. *Peniston. Van Brocklin* v. *Tennessee,* 117 U. S. 151, 177.

Of course, if Congress should think it necessary for the protection of the United States to declare such property exempted, that would present a different question. Congress did not see fit to do so here, and unless we are prepared to overrule a long line of well considered decisions the case comes within the rule therein laid down. Although in *Thomson's case* it was tangible property that was taxed, that can make no difference in principle, and the reasoning of the opinion applies.

Under the laws of California plaintiff in error obtained from the State the right and privilege of corporate capacity; to construct, maintain and operate; to charge and collect fares

and freights; to exercise the power of eminent domain; to acquire and maintain right of way; to enter upon lands or waters of any person to survey route; to construct road across, along or upon any stream, watercourse, roadstead, bay, navigable stream, street, avenue, highway or across any railway, canal, ditch or flume; to cross, intersect, join or unite its railroad with any' other railroad at any point on its route; to acquire right of way, roadbed and material for construction; to take material from the lands of the State, etc., etc. Stat. Cal. 1861, c. 532, 607; 2 Deering's Annotated Codes and Stat. Cal. 114.

It is not to be denied that such rights and privileges have value and constitute taxable property.

The general rule, as stated by Mr. Justice Miller, in *State Railroad Tax cases*, 92 U. S. 575, 603, is "that the franchise, capital stock, business and profits of all corporations, are liable to taxation in the place where they do business and by the State which creates them, admits of no dispute at this day." And the constitution of California expressly declares that the word "property" as used in section 1 of article 13, providing that "all property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value," includes franchises as well as all other matters and things capable of private ownership.

The question here is not a question of the value of the state franchise, but whether that franchise existed, for if in 1887 plaintiff in error possessed any subsisting rights or privileges, otherwise called franchises, derived from the State, then they were taxable, and the extent of their value was to be determined by the Board of Equalization.

So far as the ability of the company to discharge its duties and obligations to the general government is concerned it is difficult to see that taxation of the state franchise would tend to impair that ability any more than taxation of the roadway, roadbed, rails and rolling stock. If the necessary effect of a tax on such tangible property is not to unconstitutionally hinder the efficient exercise of the power to serve the government, neither can it be so in respect of the state franchise.

Indeed the taxation by the State of the franchise granted by it does not, and could not, prevent plaintiff in error from acting under its Federal franchise.

This was an action to recover judgment against the company under the statute, and the franchise was only an element in arriving at the valuation in making the assessment, but if the power to tax the state franchise involved the power to dispose of it at delinquent tax sale or on execution, such sale would be subject to the superior and independent rights of the United States, and the fact that this would affect the value is of no consequence. If the state franchise should be voluntarily surrendered by the company to the State, or forfeited by the State, yet the United States through the Federal franchise could still operate the road in California. And, on the other hand, should plaintiff in error in any manner be deprived of its Federal franchise, it would not thereby be prevented from operating in California under its state franchise. The right and privilege, or franchise, of being a corporation, is of value to its members and is considered as property separate and distinct from the property which the corporation may acquire; but, apart from that, if the state franchise to be assessed were confined to the right to operate the road and take tolls, such a franchise was originally granted by the State to this company, and as such was taxable property. If the subsequent acts of Congress had the effect of creating a Federal franchise to operate the road, that merely rendered the state right subordinate to the Federal right, and did not destroy the state right nor merge it into the Federal right, and no authority is cited to sustain any such proposition. No act of Congress in terms attempted to bring about this result, and no such result can be deduced therefrom by necessary implication. Whether plaintiff in error now operates its road under the franchise derived from the United States or from the State is immaterial, as the Supreme Court well said. The right to operate the road is valuable, whether it is being exercised or not, and the question, we repeat, relates to the existence of the franchise, and not to the extent of its value.

When we consider that plaintiff in error returned its fran-

chise for assessment, declined to resort to the remedy afforded by the state laws for the correction of the assessment as made if dissatisfied therewith, or to pay its tax and bring suit to recover back the whole or any part of the tax which it claimed to be illegal, we think its position is not one entitled to the favorable consideration of the court; but, without regard to that, we hold, for the reasons given, that the state courts rightly decided that the company had no valid defence to the causes of action proceeded on.

*Judgment affirmed.*

Mr. Justice White concurred in the result.

Mr. Justice Field dissenting.

I am unable to concur with my associates in their opinion or judgment in the present case.

The case comes before us on writ of error to the Supreme Court of California, affirming the judgment of the Superior Court of the city and county of San Francisco, and an order of that court, denying a new trial in an action brought by the people of the State against the Central Pacific Railroad Company to recover moneys alleged to be due by it to the State for taxes for the fiscal year of 1887, upon assessments made by the state Board of Equalization. The Supreme Court of the State affirmed the judgment of the Superior Court against that company in disregard, in my opinion, of the long established doctrine of this court, that the powers of the general government and the instrumentalities of the State, called into exercise in enforcement of those powers, cannot be impaired or their efficiency lessened by taxation or any other action on the part of the State. This doctrine has been constantly asserted by this court when called upon to express its opinion thereon, its judgment being pronounced by the most illustrious Chief Justice in its history with the unanimous concurrence of his associates. It has become a recognized principle, made familiar in the courts of the country by the decision of this court in *McCulloch* v. *Maryland*, 4 Wheat. 316, and *Osborn* v. *United States Bank*, 9 Wheat. 738. The disregard

of this doctrine in the present case recalls the aphorism of Coleridge, applied with equal force, but not more applicable, to moral principles. " Truths," he says, " of all others the most awful and interesting, are too often considered as so true that they lose all the power of truth and lie bed-ridden in the dormitory of the soul, side by side with the most despised and exploded errors." It would seem that the truth of the constitutional doctrine has lost some of its force by the very fact that it has heretofore been considered so true as never to be questioned.

By the act of Congress of July 1, 1862, c. 120, 12 Stat. 489, the Union Pacific Railroad Company was organized by Congress, and authorized and empowered to lay out, construct, furnish and maintain a continuous railroad and telegraph, with the appurtenances, from a point on the 100th meridian of longitude west from Greenwich, between the south margin of the valley of the Republican River and the north margin of the valley of the Platte River, in the Territory of Nebraska, to the western boundary of Nevada Territory; and was vested with all the powers, privileges and immunities necessary to carry into effect the purposes of the act. In aid of the great work thus inaugurated, railway corporations by the States through which the overland railroad projected was to pass were called into existence. If rights, powers, privileges and immunities were conferred by state authority upon these state corporations, they constituted a portion of their franchises, subordinate to those conferred by the general government, and comprised with those of that government an essential part of the means for the efficiency and usefulness of the auxiliary corporations.

The powers, privileges and immunities conferred upon the state corporations by the United States were necessarily paramount to those derived from the State. When the powers, privileges and immunities of such state corporations were derived solely from the authority of the State they were generally designated, when spoken of collectively, as the state franchise or franchises of the corporation, and when the rights, powers, privileges and immunities were supposed to be

derived solely from the United States they were generally designated, when spoken of collectively, as the Federal franchise or franchises of the corporation. When no indication of the source of the franchise or franchises was specified, the rights, powers, privileges and immunities involved in that term held by the defendant were usually designated as the franchise or franchises of the company specifically, without other description, and the term included the powers, privileges and immunities conferred by both Federal and state authority. The term embraced all those powers, duties and immunities which were conferred, or supposed to be conferred, upon the railroad company for its operation from either source, or from both sources.

By section 9 of the general act of 1862, mentioned above, the Central Pacific Railroad Company was authorized to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of California, upon the same terms and conditions in all respects as were contained in the act for the construction of the overland railroad and telegraph line, and to meet and connect with the railroad and telegraph line on the eastern boundary of California. Each of the companies was required to file its acceptance of the conditions of the act in the Department of the Interior within six months after its passage.

By the tenth section of the general act the Central Pacific Railroad Company, after completing its road across the State of California, was authorized to continue the construction of the railroad and telegraph through the territories of the United States to the Missouri River, including the branch roads specified in the act, upon the routes indicated, on the terms and conditions provided in the act in relation to the Union Pacific Railroad Company, until the roads should meet and connect, and the whole line of the railroad and branches and telegraph should be completed.

By section 16 of the act mentioned power was given to the Central Pacific to consolidate with the other companies named therein.

By section 17 it was provided that in case the company or companies failed to comply with the terms and conditions of the act, Congress might pass an act to insure the speedy completion of the road and branches, or put the same in repair and use, and direct the income of the railroad and telegraph line to be thereafter devoted to the use of the United States; and further, that if the roads mentioned were not completed so as to form a continuous line from the Missouri River to the navigable waters of the Sacramento River by July 1, 1876, the whole of the railroads mentioned and to be constructed under the provisions of the act, together with all their property of every kind and character, should be forfeited to and taken possession of by the United States.

The eighteenth section provided that when the net earnings of the entire road should reach a certain percentage upon its cost, Congress might reduce the rates of fare thereon, if unreasonable in amount, and might fix and establish the same by law; and it declared that the better to accomplish the object of the act, namely, to promote the public interest and welfare by the construction of the railroad and telegraph line, and to keep the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military and other purposes, Congress might, at any time, having due regard for the rights of the companies named, add to, alter, amend or repeal the act, and the companies were required to make annual reports as to the matters mentioned to the Secretary of the Treasury.

By the act of Congress of July 2, 1864, c. 216, 13 Stat. 356, amendatory of the act of July 1, 1862, additional powers, rights, privileges, immunities and property were granted to the companies engaged in the great national work proposed by Congress in the former act, in order to secure the completion of that work, which, at that time, was of imminent necessity.

By section 16 of this last act it was provided that should the Central Pacific Railroad Company complete its line to the eastern boundary of the State of California before the line of

the Union Pacific Railroad shall have been extended westward so as to meet the line of the first named company, that company might extend its line eastward · one hundred and fifty miles on the established route so as to meet and connect with the line of the Union Pacific Railroad, complying in all respects with the provisions and restrictions of the act as to the Union Pacific Railroad, and when it was completed should enjoy all the rights, privileges and benefits conferred by the act on the latter company.

It is found by the court that the Central Pacific Railroad Company accepted the provisions of the acts of 1862 and 1864; and that on or about October 21, 1864, that company assigned to the Western Pacific Railroad Company, a corporation created and then existing under the laws of California, all its rights under the acts of Congress, so far as they related to the construction of the railroad and telegraph line between the cities of San José and Sacramento, in California; and that this assignment was ratified and confirmed by Congress, in the act of March 3, 1865, to amend the constituting acts of 1862 and 1864.

The act of March 3, 1865; c. 88, 13 Stat. 504, provided that section 10 of the act of July 2, 1864, should be so modified and amended as to allow the Central Pacific Railroad Company, and the Western Pacific Railroad Company of California, the Union Pacific Railroad Company, and the eastern division of the Union Pacific Railroad Company, and all other companies provided for in the act of July second, eighteen hundred and sixty-four, to issue their six per centum thirty years' bonds, interest payable in any lawful money of the United States, upon their separate roads. And the companies were thereby authorized to issue respectively their bonds to the extent of one hundred miles in advance of a continuous completed line of construction, and the assignment made by the Central Pacific Railroad Company of California to the Western Pacific Railroad Company of the State, of the right to construct all that portion of the railroad and telegraph from the city of San José to the city of Sacramento, was thereby ratified and confirmed to the Western Pacific Railroad Company,

with all the privileges and benefits of the several acts of Congress relating thereto, subject to the conditions thereof.

The Central Pacific Railroad Company was empowered by the State of California to construct within its limits various lines of railroad, and to equip them with the appurtenances essential to give to their operations efficiency and usefulness. It is conceded that until April 4, 1864, the Central Pacific Railroad Company and other railroad corporations of the State exercised and enjoyed what are termed the franchises of its corporations, that is, the rights, powers, privileges and immunities conferred upon them by state authority, and also various powers, duties, privileges and immunities conferred upon them by the general government, and which are termed their Federal franchises. But on that date, the 4th of April, 1864, the legislature of California abrogated the state franchises of those corporations, and substituted by adoption in their place the Federal franchises which have remained in force ever since.

The provisions of the act of Congress of July 1, 1862, and of July 2, 1864, state with entire distinctness the rights, powers, duties, privileges and immunities of the principal railroad — that of the Union Pacific — and of the auxiliary roads connecting therewith. The most essential features are the following:

I. The act of July 1, 1862, authorized the Union Pacific Railroad Company to construct its road, vesting it with all powers necessary for that purpose, and requiring it to transport mails, troops and munitions of war. This was a plain exercise of the express power "to establish post roads" and of the implied power to construct military roads.

II. The same act authorized the Central Pacific Railroad Company to construct its road on the same terms and conditions as those of the Union Pacific.

III. The third section of the act of July 2, 1864, provided in the usual form for the exercise by both companies of the Federal right to acquire the right of way for the construction of these post and military roads.

IV. The Central Pacific company was thus made the agent of the government in its exercise of the constitutional

power to establish post roads and military roads. No state law could have obstructed or impeded the Federal government in the exercise of this power or in any degree whatever have limited or facilitated the Central Pacific company in the enjoyment of the Federal franchise thus conferred.

V. If the consent of the State was necessary to the establishment of this road by the United States it will be found in the statute of California enacted in 1852, which, independent of its preamble, reads as follows:

"SEC. 1. The right of way through this State is hereby granted to the United States for the purpose of constructing a railroad from the Atlantic to the Pacific Oceans." Statutes of California of 1852, ch. 77, § 1, p. 150.

If the consent of the State was necessary to the complete substitution of the Federal franchise for any then existing state franchise for the construction of the road, it will be found in the act of the legislature of the State of California of April 4, 1864, which, after a comprehensive grant to the company of all necessary privileges and powers, including the State's right of eminent domain, made, as the act recites, "to enable said company more fully and completely to comply with and conform to the provisions and condition of said act of Congress," concludes with the following language: "Hereby confirming to and vesting in said company all the rights, privileges, franchises, power and authority conferred upon, granted to, or vested in said company by said act of Congress; hereby repealing all laws and parts of laws inconsistent or in conflict with the provisions of this act or the rights and privileges herein granted." Statutes of California, 1863–'64, c. 417, § 1, p. 471. In the opinion of the majority of the court, delivered by the Chief Justice, it is said that the general rule expressed by Mr. Justice Miller in the *State Railroad Tax cases*, 92 U. S. 575, "that the franchises, capital stock, business and profits of all corporations are liable to taxation in the place where they do business and by the State which creates them," admits of no dispute at this day, and then the opinion adds that the question here is not a question of the value of the state franchises, but

whether those franchises existed, for if in 1887 the plaintiff in error (the Central Pacific Railroad Company) possessed any subsisting rights or privileges, otherwise called franchises, derived from the State, then they were taxable, and the extent of their value was to be determined by the Board of Equalization. A complete answer to the ground of the opinion is found in the act of the legislature of California of April 4, 1864, passed twenty-three years before 1887, to which I have above referred, which abrogated the state franchises previously existing, and substituted in their place the Federal franchises.

The Federal franchises for the construction of the Central Pacific Railroad from the Pacific coast to the eastern boundary line of California as a part of the continuous military and post road to the Missouri River established by Congress could have had no rival in a state franchise for the construction of the same road; but in order that this might never be questioned, the legislature of the State of California obliterated its own franchises when it ratified and confirmed the franchises given by the Federal government to the Central Pacific Railroad Company. How then can the State twenty-three years later tax alleged state franchises claimed by its authorities to underlie the Federal franchises? Suppose the alleged state franchises should be sold for a delinquent tax thereon under the authority of the State, and an attempt should be made to place the purchaser in possession, a Federal judge would, of course, be applied to for an injunction, which would undoubtedly be granted, and the shadow of the shade of the state franchises would appear no more.

But, notwithstanding this express abrogation of the state franchises, meaning by that the powers, duties, rights, privileges and immunities of the state corporations conferred by the legislature of the State of California, and the substitution in place thereof of the franchises conferred by the general government, the State of California has since the abrogation of the state franchises and the substitution of the Federal franchises in various ways subjected that railroad and its franchises, whether derived from state or Federal authority, which were

essential to the successful working of the road brought into existence by the Federal government, to heavy burdens in the way of taxation, and thus imposed an additional obstacle to the efficiency of the Central Pacific Railroad in the execution of the general operations of the overland railroad.

The question presented is whether the burden thus imposed upon the franchises, roadbed, rails and rolling stock of railroads, whether or not operated in more than one county, can be lawfully assessed upon them when they constitute the grant of the general government, or an essential part of, or are appurtenant to the franchises of the state corporation which is used as an instrumentality of the overland road. The state Board of Equalization has assessed the franchises of the State as a distinct element in the estimate of the valuation of the railroad, carrying its estimate to an enormous sum in many instances, as, in the present case, to the sum of eighteen millions, and at the same time it has assessed the Federal franchises, that is, those derived from the general government, as a distinct and separate element in the estimate of the valuation of the railroad, and has blended the two franchises in determining the valuation of the railroad for the purpose of taxation.

It seems to me as an extravagant if not an absurd position, in the face of the specific legislation by the State, abrogating its franchises of the Central Pacific Railroad Company, and substituting the Federal franchises in their place, to contend that the state franchises still exist and can be enforced and be made the subject of estimate in the valuation of the railroad for taxation. The Federal franchises, standing alone, cannot be impeded or hampered in any way by state legislation. This would follow had not the State expressed itself in the emphatic way it has done: "Confirming to and vesting in said company all the rights, privileges, franchises, powers and authority conferred by the grant to or vested in said company by said act of Congress, hereby repealing all laws and parts of laws inconsistent or in conflict with the provisions of this act, or the rights and privileges herein granted." The state franchises thus abrogated and discarded cannot be again

restored to life by mere words, however often repeated and with whatever asseveration made.   The dishonored franchises are gone forever.

Independently of this view, the two franchises, the so called state franchise and the so-called Federal franchise, if both exist at the same time, are to be treated as necessarily so blended together that they cannot be separated and given a distinct valuation in the total estimate.   And even when separated, were that possible, the inevitable blending follows the moment the value of the railroad becomes a matter of serious consideration for the purpose of fixing the amount of the assessment.   I construe the state and Federal franchises as being simply the right conferred upon them to complete and operate the road.   And whatever part the state or Federal franchises may have played in accomplishing this result, the separate effect of either cannot be distinguished from the other, and apply to each and every mile of the road.   The two franchises have interlaced each other at every step of their exercise.   It follows that the separate estimation of the taxation of the so called state franchises when they existed, which, as appears, was only for a limited period, was impossible, and, for many reasons, which we will state, it was never intended that such state franchises should be assessed and taxed as a separate entity in the estimate of the value of the railroad.

In the case of *California* v. *Pacific Railroad,* 127 U. S. 1, 34, this court decided that, as the assessments of the state Board of Equalization against the Central Pacific Railroad Company of 1883 and 1884, and the assessment against the Southern Pacific Railroad Company of 1883, included the franchises conferred by the United States upon those corporations, respectively, the assessments were void as repugnant to the Constitution and laws of the United States and the power of Congress to regulate commerce among the several States. 127 U. S. 41, 42, 43.

It appears by the record that the complaint in this action contains nineteen counts, upon the same number of alleged causes of action.   The first count is for state taxes; the other counts are for county taxes.

In *People* v. *Central Pacific Railroad Co.*, 83 California, 393, 399, it was held by the Supreme Court of the State that section 3670 of its Political Code, prescribing a special form of complaint, was in conflict with its constitution, and that a complaint in an action to recover taxes levied upon a railroad could not join causes of action in favor of the several counties through which the road runs. But that is not material in the present action.

Each of the eighteen counts alleges that the defendant is a corporation organized and existing under the laws of California, engaged in operating a railroad in more than one county of the State. The State sets forth its claims for a recovery, and asks for judgment in its favor for the several assessments stated against the franchises, or some portion thereof, which constitute a grant of the general government, or appurtenances to the grant of the state corporation, rendering it efficient and useful as an instrumentality of the overland road, the great work undertaken by the general government. The complaint alleges in its several counts that in August, 1887, which, as stated above, was twenty-three years after the state franchises to the defendant had been abrogated and annulled, the state Board of Equalization, for the purpose of state and county taxation for the fiscal year ending June 30, 1888, assessed to the defendant, then the owner and operator thereof in more than one county in the State, the franchise, roadway, roadbed, rails and rolling stock of the defendant's railway, then within the State, at the sum of eighteen millions of dollars; and that within ten days after the third Monday in August of that year the board apportioned the total assessment of the franchise, roadway, roadbed, rails and rolling stock of the defendant to the counties in the State in which defendant's railway was located, in proportion to the number of miles of defendant's railway laid in such counties; and the amounts of the total assessment thus apportioned by the board to the counties respectively, and the number of miles of defendant's railway laid in the counties respectively.

The complaint concludes with a demand for judgment

against the defendant for the several sums of state and county tax alleged to be delinquent and unpaid as stated therein, aggregating the sum of $295,740.71, with five per cent thereon for delinquency and non-payment, with interest at the rate of two per cent on the amount from the last of December, 1887; also for the costs of suit and for attorney's fees.

To the complaint a demurrer, general and special, was interposed by the defendant. The Superior Court overruled the demurrer with leave to the defendant to answer the complaint.

The answer of the defendant puts in issue most of the material allegations of the complaint, and sets up various special and affirmative defences. One of those defences is that the "franchise" assessed to the defendant by the state Board of Equalization was derived from the government of the United States through certain acts of Congress (commonly known as the Pacific Railroad Acts); that the same is held and used by the defendant as one of the means and instrumentalities of the Federal government, and was, therefore, not taxable by the State; and that the assessment of this franchise was so blended with the whole assessment as not to be separable therefrom; and that the whole assessment was, therefore, void.

On the trial of the issues presented by the pleadings, the complainant was allowed by the court, against the objection of the defendant, to introduce in evidence (1) the duplicate record of assessment of railways by the state Board of Equalization for 1887, filed in the office of the comptroller of the of the State of California, October 11, 1887. The court overruled the objections of the defendant and admitted the paper in evidence, and an exception was taken to the ruling of the court. The duplicate record of assessment of railways by the state Board of Equalization for 1887, which was dated August 13, 1887, simply states that the defendant owns a certain railway in the State, operated in more than one county, being the entire railway of the company in the State, and then follows this paragraph, without any evidence in support of its averment:

"And it appearing that the actual value of the franchises,

roadway, roadbed, rails and rolling stock of said company within the State, at the said date and time, was and still is the sum of eighteen million dollars; therefore, it is hereby ordered that the said franchise, roadway, roadbed, rails and rolling stock, for the year 1887, be, and the same are hereby, assessed to the said Central Pacific Railroad Company at the sum of eighteen million dollars."

The evidence mentioned in the duplicate record of assessment of railways was the only proof offered by the plaintiff in support of any of its causes of action, and that evidence, it is plain, was not entitled to any weight in the determination of the case, not being supported by any other evidence.

On the part of the defendant evidence was offered to show that the state Board of Equalization knowingly included the value of the "Federal franchise" in the assessment in question, as it had done in the assessment which was afterwards before this court, and declared void, in *California* v. *Pacific Railroad Company*, and in other assessments.

The findings of the Superior Court, as to the allegations of the complaint, were that they were true, except as to counsel fees, as to which it was found that a reasonable compensation for the services of two of the counsel employed was 7½ per cent on the amount recovered, and 2½ per cent for the third counsel.

As to the affirmative allegations for the answer, the court among other things found:

"That on the 13th day of August, 1887, the state Board of Equalization of the State of California did, for the purposes of taxation for the fiscal year 1887, assess, as a unit, and not separately, the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad, then being and situate within the State, at the sum and value mentioned in the amended complaint, and did then and there enter such assessment upon its minutes and in its record of assessment; that such assessment is the one upon which the several taxes mentioned in the complaint herein are based, and no other assessment than the one aforesaid was ever made by the Board of Equalization or other assessor of the property of defendant for the fiscal year;

that the board did, at the time and in the manner alleged in the amended complaint, apportion the assessment and transmit it and the apportionment to the county and city and county auditors, and the assessment and the apportionment thereof were entered upon the assessment rolls of the counties and the cities and counties as alleged in the amended complaint, as hereinbefore found.

"That the board of equalization, in making the assessment, did assess the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad at their full cash value, without deducting therefrom the value of the mortgage or any part thereof, or the value of the bonds issued under the acts of Congress, given and existing thereon, as aforesaid, to secure the indebtedness of the company to the holders of the bonds, and, in making such assessment the board did not deem nor treat the mortgage or bonds as an interest in the property, but it assessed the whole value of the property as assessed to defendant in the same manner it would have done had there been no mortgage thereon."

The conclusions of law from the findings were that plaintiff was entitled to recover judgment for the several principal sums of state and county taxes, found in the record of assessments of railways to be delinquent and unpaid; also interest upon the principal sums from the 27th day of December, 1887, at the rate of seven per cent per annum, up to the date of judgment; also to recover five per cent penalty upon the principal sums; also fees for legal services rendered herein by two of the counsel, a sum equal to seven and one-half per cent on the amount recovered, and by the third counsel a sum equal to two and one-half per cent of that amount.

Judgment was entered upon the findings, in favor of the plaintiff, for the sums mentioned, and a motion for a new trial was overruled.

The majority of the Supreme Court of the State, in their opinion, sustained the contentions of the State upon the questions presented, with the exception of the questions in respect to interest on the amount of taxes, and the fees of one of the counsel, and affirmed the judgment entered.

Mr. Justice McFarland dissented from the opinion of the court. This dissenting opinion expresses so fully and clearly and satisfactorily the views which I entertain, that they are set forth in full:

"In my opinion," says Justice McFarland, pp. 598, 599, "the assessment in question [that of 1887] is void under the decisions of the Supreme Court of the United States in the cases of *California* v. *Central Pacific Railroad Company and Southern Pacific Railroad Company*, 127 U. S. 1, because it includes a Federal franchise, and thus attempts to tax one of the means or instrumentalities employed by the United States government for carrying into effect its sovereign powers. That this cannot be done by a State has been the established law ever since the decision of the Supreme Court in *McCulloch* v. *Maryland*, 4 Wheat. 316, in 1819. The principle was fully recognized and declared by this court in *San Benito County* v. *Southern Pacific Railroad*, 77 California, 518, and in *San Francisco* v. *Western Union Telegraph Co.*, 96 California, 140.

"The only difference between the cases in 127 U. S. and the case at bar is that in the former the trial court found that the state Board of Equalization included in the assessment the value of ' all franchises and corporate powers held and exercised by the defendant,' while in the case at bar the court below found that the said board in making the assessment for the year 1887 ' did not include in its said assessment any Federal franchise.' But the assessment in both instances was exactly the same, namely, ' the franchise' of the railroad. In the former cases it does not appear that the trial court received any evidence on the question as to what ' the franchise' included ; and it is probable that the finding was based upon the language of the assessment alone. In the case at bar the court did receive evidence as to what the members of the board intended by the words ' the franchise,' and it appears in the record that the court, after having concluded that ' from a preponderance of evidence before it the Federal franchise of defendant was not assessed or included in the assessment,' proceeded to say that ' if by a preponderance of such evidence defendants could have shown that the State

intended to and did include the Federal franchise in the assessment, I think the court would have to disregard it as incompetent. The effect of such parol evidence would be to contradict the record, which cannot be done.' Now, if it was competent to introduce testimony to show the intent of the members of the board when they made the assessment, then the court clearly erred in ruling out certain evidence offered on that point by appellant. . . .

" On the other hand, if the record of the board should alone be considered, then it simply appears that 'the franchise' was assessed; and I cannot possibly see how that phrase can be construed to mean anything else than the whole franchise of the railroad — all of the franchise belonging to it. It means just what the lower court has found it to mean, as above quoted, in said cases in 127 U. S. The words 'the franchise' clearly, in my judgment, include the right of the appellant to do business — and the whole of that right. That right is a unit and inseparable. The court below found [see finding 30] that the board 'did assess as a unit, and not separately, the franchise, roadway,' etc. And I cannot conceive how a court can, first, separate it, or, second, if it could, how it could determine which part to throw away. Moreover, the main foundation of the doctrine of *McCulloch* v. *Maryland*, 4 Wheat. 316, is that the power to tax includes the power to destroy; and thus a State might, under the guise of taxation, destroy or materially cripple an instrumentality of the Federal government. And is it not manifest that in the case at bar that principle protects the instrumentality here involved from injury or destruction under the pretence that only that part of the unity which comes from the State is taxed? Are not the effects and consequences the same?

" In my opinion, therefore," adds the dissenting Justice, " without discussing the other questions involved, the judgment should be reversed."

To review and reverse the judgment of the Supreme Court, affirming the judgment of the Superior Court for the city and county of San Francisco, a writ of error to the Supreme Court of the State was sued out of this court, and several assign-

ments of error were filed for its consideration.  My attention will be confined to those deemed the most important.

1st.  The Supreme Court should have reversed the judgment of the Superior Court for the city and county of San Francisco on the ground that upon the finding of facts in the record the value of the "franchise" of the Central Pacific Railroad, derived from the United States, called Federal franchise, was included in the assessment of the franchise, roadway, roadbed, rails and rolling stock of the railroad, made by the state Board of Equalization for the year 1887, and was inseparable therefrom; and that the whole of the assessment was therefore illegal and void under the Constitution and laws of the United States.

2d.  The Supreme Court should have reversed the judgment of the Superior Court, because that court found that the state Board of Equalization on August 3; 1887, did, for the purpose of taxation for the fiscal year, 1887, assess as a unit, and not separately, the franchise, roadway, roadbed and rolling stock of the Central Pacific Railroad, then being within the State of California.

3d.  The Supreme Court should have reversed the judgment of the Superior Court upon the ground that the property of the Central Pacific Railroad Company, including the franchise, and every part of the franchise of the railroad was and is subject to the lien of the mortgage of the United States to secure the indebtedness of that company to it, and the United States had and have an interest and ownership therein to the extent of the lien, and, therefore, the franchise of the railroad could not and cannot be taxed or assessed for taxation by the State of California, under the Constitution and laws of the United States.

4th.  The Supreme Court should have reversed the judgment of the Superior Court on the ground that that court admitted in evidence the portion of the duplicate record of assessment of railways by the state Board of Equalization for the year of 1887, relating to the assessment of the property of the plaintiff in error for that year *without proof of its correctness.*

The facts which are the basis of the several assignments of

error are contained in the legislation or authorized statements of Congress or of the States mentioned, or in the findings of the court. Their legality and validity are thereby fully established.

By the legislation of Congress to which I have referred, as well as by the legislation of the State of California, it is plain that the Central Pacific Railroad Company was made one of the means of accomplishing the great work of Congress, and whenever, by any act of the state authorities of California, the franchise of the Central Pacific Railroad Company was included in the assessment of the franchise, roadway, roadbed, rails and rolling stock of that company, there was necessarily included the franchise thus derived from the legislation of Congress. Indeed, treating the franchise of the railroad as meaning its power to construct the work contemplated and to conduct its operations, it is difficult to see how, in any respect, its franchise could be treated other than as one entire whole. Its power to construct the road authorized by the government, and to carry on its operations, could not be under the control of the state authorities so as to interfere in any respect with the full exercise of the powers, privileges and immunities granted by Congress.

And it was specially found by the court below, in its thirtieth finding of fact, that the state Board of Equalization on August 13, 1887, for the purpose of taxation for the fiscal year 1887, assessed as a unit, and not separately, the franchise, roadway, roadbed, rails and rolling stock. It was, therefore, unlawful that its taxation by the State should in any respect impede, retard or delay the exercise of the powers conferred by Congress upon the Central Pacific Railroad Company or defeat its action. Nor could any part of the powers, privileges and immunities conferred upon the railroad be separated from the rest, so as to be treated as an independent part thereof, and any part considered as the special grant of the State, and superior to or in any way impairing the control thereof by the United States pursuant to their legislation.

It also appears from the legislation of Congress that the Secretary of the Treasury was authorized to issue and did

issue to the Central Pacific Railroad Company bonds of the
United States, in designated amounts per mile, to aid in
the construction of its road, which bonds and interest were
to be repaid by the company, at their maturity, and that, to
secure such repayment, the United States were to hold a lien
upon all the property of the railroad company to the extent
of the bonds thus issued. Any taxation of the property or
franchises of the Central Pacific Railroad Company, without
the consent of Congress, was hence an impairment of such
lien of the United States, and, therefore, invalid.

The Superior Court of the city and county of San Francisco
erred in receiving in evidence the portion of the duplicate
record of the assessment of railways by the state Board of
Equalization for the year 1887, relating to the assessment of
the property of the plaintiff in error, for the obvious reason
that such duplicate in no way established the legality and
validity of the assessment.

This court, in the case of *California* v. *Pacific Railroad
Companies*, 127 U. S. 1, adjudged that the State of California
had no power, without the consent of Congress, to tax the
franchises derived by the Central Pacific Railroad Company
from the government of the United States, or any franchise
conferred on it by that government, or any part of any fran-
chise granted to that company by the United States. The
opinion of the court was delivered by Mr. Justice Bradley.

"Assuming," he said, "that the Central Pacific Railroad
Company has received the important franchises referred to
by grant of the United States, the question arises whether
they are legitimate subjects of taxation by the State. They
were granted to the company for national purposes and to
subserve national ends. It seems very clear that the State
of California can neither take them away, nor destroy nor
abridge them, nor cripple them by onerous burdens. Can it
tax them? It may undoubtedly tax outside visible property
of the company situated within the State. That is a different
thing. But may it tax franchises which are the grant of the
United States? In our judgment it cannot. What is a fran-
chise? . . . Generalized, and divested of the special form

which it assumes under a monarchical government based on feudal traditions, a franchise is a right, privilege or power of public concern, which ought not to be exercised by private individuals at their mere will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest, and for the public security. Such rights and powers must exist under every form of society. Under our system, their existence and disposal are under the control of the legislative department of the government, and they cannot be assumed or exercised without legislative authority. No private person can establish a public highway, or a public ferry, or railroad, or charge tolls for the use of the same, without authority from the legislature, direct or derived. These are franchises. No private person can take another's property, even for a public use, without such authority; which is the same as to say, that the right of eminent domain can only be exercised by virtue of a legislative grant. This is a franchise. No persons can make themselves a body corporate and politic without legislative authority. Corporate capacity is a franchise. The list might be continued indefinitely.

"In view of this description of the nature of a franchise, how can it be possible that a franchise granted by Congress can be subject to taxation by a State without the consent of Congress? Taxation is a burden, and may be laid so heavily as to destroy the thing taxed, or render it valueless. As Chief Justice Marshall said in *McCulloch* v. *Maryland*, 'the power to tax involves the power to destroy.' Recollecting the fundamental principle that the Constitution, laws and treaties of the United States are the supreme law of the land, it seems to us almost absurd to contend that a power given to a person or corporation by the United States may be subjected to taxation by a State. The power conferred emanates from, and is a portion of, the power of the government that confers it. To tax it, is not only derogatory to the dignity, but subversive of the powers of the government, and repugnant to its paramount sovereignty. It is unnecessary to cite cases on this

subject. The principles laid down by this court in *McCulloch*
v. *Maryland*, 4 Wheat. 316; *Osborn* v. *The Bank of the
United States*, 9 Wheat. 738; and *Brown* v. *Maryland*, 12
Wheat. 419, and numerous cases since which have followed in
their lead, abundantly sustain the views we have expressed.
It may be added that these views are not in conflict with the
decisions of this court in *Thomson* v. *Pacific Railroad*, 9
Wall. 579, and *Railroad Co.* v. *Peniston*, 18 Wall. 5. As ex-
plained in the opinion of the court in the latter case, the tax
there was upon the property of the company, and not upon its
franchises or operations. 18 Wall. 35, 37.

"The taxation of a corporate franchise merely as such,
unless pursuant to a stipulation in the original charter of the
company, is the exercise of an authority somewhat arbitrary
in its character. It has no limitation but the discretion of the
taxing power. The value of the franchise is not measured
like that of property, but may be ten thousand or ten hun-
dred thousand dollars, as the legislature may choose. Or,
without any valuation of the franchise at all, the tax may be
arbitrarily laid. It is not an idle objection, therefore, made
by the company against the tax imposed in the present case."

The important cases bearing upon the subject intervening
between the great *Bank cases* and *Thomson* v. *Pacific Rail-
road* and *Railroad Company.* v. *Peniston*, were *Weston* v. *The
City of Charleston*, 2 Pet. 449, 467; *Dobbins* v. *Commissioners
of Erie County*, 16 Pet. 435; *Bank of Commerce* v. *New York
City*, 2 Black, 620; *The Banks* v. *The Mayor*, 7 Wall. 16, and
*National Bank* v. *Commonwealth*, 9 Wall 353; and in those
cases the doctrine was consistently maintained and enforced
that a State cannot lay a tax which bears upon a power of the
National Government, or, in the judgment of the court, may
hinder, impair or burden any "operation" of that Government,
or interfere with or affect the efficiency of any "agency" of
the National Government in performing the functions by
which it is designed to serve the United States.

In *Weston* v. *The City of Charleston*, this court declared the
tax on the stock of the United States, involved, to be unconsti-
tutional, because it "operated upon the power" to borrow

money on the credit of the United States, and was deemed by the court to be " a burden, however inconsiderable," on "the operations of government."

The court, speaking by Chief Justice Marshall, in that case, again declared that the State cannot by taxation, or otherwise, " retard, impede, burden or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the General Government."

The case of *Dobbins* v. *The Commissioners of Erie County,* adjudged that a state tax on an officer of the United States, for his office, or its emoluments, was void, mainly because of " its interference with the constitutional means" employed by the government to execute its powers.

The court, speaking by Mr. Justice Wayne, said: " Does not a tax by a State upon the office, diminishing the recompense, conflict with the laws of the United States, which secures it to the officer in its entirety?   It certainly has such an effect; and any law of a State imposing such a tax cannot be constitutional, because it conflicts with a law of Congress made in pursuance of the Constitution."

The principles declared in *Weston* v. *The City of Charleston* governed the decisions of the court in *Bank of Commerce* v. *New York City* and in *The Banks* v. *The Mayor,* which adjudged that the bonds and other securities of the United States are " as much beyond the taxing power of the States as the operations themselves in furtherance of which they were issued."

The court again declared, in those cases, that any interference by the state governments tending to the interruption of, or in derogation of, the full legitimate exercise of the powers granted to the National Government was prohibited by the Constitution.

The theory of the majority of the court below was that the franchise of this railroad can be segregated into two franchises, a state franchise and a Federal franchise.   But the franchise of the railroad, or the right in the company to operate its railroad, is a single right, from how many sources soever

derived; and, being derived from the National Government, that right could not be assessed for taxation, agreeably to the Constitution of the United States, whether or not the right had been granted by the State also to the railroad company. The theory of the separation of the franchise into two distinct rights for the purpose of taxation by California is effectually disposed of by Mr. Justice McFarland, at the close of his opinion, in these few words:

"The court below found that the board 'did assess as a unit, and not separately, the franchise, roadway,' etc. *People* v. *Cent. Pac. Rd. Co.*, 105 California, 599. I cannot conceive how a court can, first, separate it, or second, if it could, how it could determine which part to throw away. Moreover, the main foundation of the doctrine of *McCulloch* v. *Maryland* is that the power to tax includes the power to destroy, and thus a State might, under the guise of taxation, destroy or materially cripple an instrumentality of the Federal Government. And is it not manifest that in the case at bar that principle protects the instrumentality here involved from injury or destruction under the pretence that only that part of the unity which comes from the State is taxed? Are not the effects and consequences the same?"

The fact that each government has granted the right, does not create two rights. The two grants taken together confer nothing more than each of them separately conferred. A tax on "the franchise" of the Central Pacific Railroad, being nothing more nor less than a tax on the right of the company to operate its road, is a tax on its right to operate its railroad granted by the United States, or on the franchise granted by that government.

How is that part of the franchise granted by the State to be separated from that part granted by the General Government? What part of the life of this being is at the mercy of the State? Upon what member of its body may the tax collector execute his judgment of death?

If we should consider the right of the Central Pacific Railroad Company to operate its road, derived from the State, as one thing, and its same right derived from the United States

as another and distinct, or different, thing, what results will follow? Plainly these.

If the State can tax the right so derived from itself, it can levy a tax upon it as it pleases, and may sell the right assessed, in case of non-payment of the tax. There can be no such thing as taxable property which cannot be sold for the tax, and the title to which cannot be transferred to the purchaser. By such a sale the property will pass from the delinquent to the purchaser. If a sale could be made of this particular right, then the Central Pacific would lose the right, and the purchaser would gain it.

It is obvious that the right to operate its railroad cannot, by virtue of the State's taxing powers, be taken from the Central Pacific Railroad Company, or conferred upon any other corporation or individual. Nothing, then, would pass by such a sale, and as there is nothing to sell or transfer, there can be nothing to assess.

If the position asserted by the defendant in error, the State of California or the people of the State, (considering both expressions as meaning substantially the same contesting organization,) that the so called state franchise of the Central Pacific Railroad can be separated from the Federal franchise of that company, and separately valued, and subjected to taxation, be maintained, destructive consequences would follow, as will be seen from a brief consideration.

In *Northern Pacific Railroad* v. *Trail County*, 115 U. S. 600, 610, the court, in referring to a sale, for taxes, of lands belonging to a railroad company, said: " A valid sale for taxes being the highest exercise of sovereign power of the State must carry the title to the property sold, and if it does not do so, it is because the assessment is void. It follows that if the assessment of these taxes (those previously stated to have been levied upon the lands of the company) is valid and the proceedings well conducted, the sale confers a title paramount to all others, and thereby destroys the lien of the United States for the costs of surveying these lands. If, on the other hand, the sale would not confer such a title, it is because there exists no authority to make it." There would seem to be no doubt,

therefore, that the State cannot be held to have had the power
to tax the so called state franchise of the Pacific Railroad so
long as it was of any validity, and previously and subsequently
to its abrogation the State plainly possessed no such power
unless the court is prepared to decide expressly, as the effect of
the legislation, that Congress intended that the State should
be able to divest the company of that franchise, and to trans-
fer by a tax sale the title of the franchise to the purchaser as
against both the company and the United States; and in that
way to destroy the right and interest of the government of
the United States in the franchise.   There is clear and conclu-
sive evidence in the Pacific Railroad legislation that Congress
intended that the so called state franchise, so long as it re-
mained of any value, should not be subject to state legislation,
and that the right and interest of the United States therein,
whilst of any value, should not be destroyed by the State in
the exercise of its taxing power.   For example, section 5 of
the act of July 1, 1862, provides that the issue and delivery of
bonds to the company, referring to bonds the issue and de-
livery of which were authorized by the act, shall *ipso facto*
constitute a first mortgage on the whole line of the railroad
and telegraph, together with the rolling stock, fixtures and
property of every kind and description, and on the refusal or
failure of the company to redeem its bonds, or any part of
them, when required by the Secretary of the Treasury in
accordance with the provisions of the act, then the road, with
all rights, functions, immunities and appurtenances thereunto
belonging, also all lands granted to the company by the
United States, may be taken possession of by the Secretary of
the Treasury for the use and benefit of the United States.
The only change made in this provision in regard to the se-
curity of the United States for the subsidy bonds is by section
10 of the act of 1864, which is that "the lien of the United
States bonds shall be subordinate to that of the bonds of any
or either of said companies hereby authorized to be issued on
their respective roads, property and equipments, except as
to the provisions of the sixth section of the act, to which this
act is an amendment relating to the transmission of dispatches,

and the transportation of mails, troops, munitions of war, supplies and public stores for the government of the United States."

The subsidy bonds are, therefore, a mortgage upon any subsisting state franchise of the railroad, which may be taken possession of by the Secretary of the Treasury for the use and benefit of the United States, on the refusal or failure of the company to redeem the bonds, or any part of them, when required by the Secretary of the Treasury. Congress manifestly intended that the rights of the United States under this mortgage, in respect to the state franchise, if any such existed, should not be destroyed or disturbed by the State in the exercise of its taxing power, or any other power. If the so called state franchise of the railroad is a thing of value, as the assessment in these cases claims it to be, in the estimation of the state Board of Equalization, it is a valuable part of the security of the United States for the redemption of the subsidy bonds, which the Secretary of the Treasury has the right to take possession of in the contingency mentioned in the act. The franchise, if it existed and possesses any value, cannot, therefore, in my opinion, be taken from under the mortgage, and transferred to a purchaser at a tax sale by the State of California.

Take, again, the provisions of the sinking fund act of May 7, 1878, which appropriates and applies the earnings of the company in the exercise of all the franchises of the company for the purposes and in the manner named. In the face of that act, it cannot be believed that Congress supposed that there was power reserved to the State to control or affect its interest or right in the franchise or franchises of the railroad, so long as it or they possessed any value.

There can be no doubt that a tax to be levied on the so called state franchise, whilst it was in existence, was a tax upon an instrumentality by which the government effects its objects, and a tax upon the operations of that instrumentality, within the doctrines of this court in the great cases to which I have referred.

The United States selected this corporation as an agency for carrying out a national object, and the right of the cor-

poration to operate its railroad, or, in other words, the franchise of the railroad, whether conferred by state or national authority, or by both the State and Nation, is an instrumentality by which the United States effects its objects.

As a tax on the franchise of the Central Pacific Railroad while in existence was nothing more nor less than a tax on the right of the company to operate its railroad, such a tax was a tax on its right to operate its railroad derived from the government of the United States, and, therefore, unconstitutional.

There are no operations of the corporation, as an agency of the government, which are performed exclusively in the exercise of any state franchise in connection with its railroad, assuming the existence of any such franchise, but all its operations are in the exercise of its entire franchise, and a tax purporting to be levied on any state franchise is, therefore, a tax on the operations of the corporation in the exercise of the Federal franchise, and a tax directly on the Federal franchise itself.

In *National Bank* v. *The Commonwealth*, where the right of the States to tax the shares of the national banks was reaffirmed, it was expressly conceded that the agencies of the National Government are uncontrollable by state legislation so far as it may interfere with, or impair, their efficiency, in performing the service, or the functions, for which they are employed, or designed to perform.

The Supreme Court of California in the case of *San Benito County* v. *Southern Pacific Railroad*, 77 California, 518, accepted the authority of the decision of this court, in *California* v. *Pacific Railroad Companies*, 127 U. S. 1, and held that an ordinance of the board of supervisors of San Benito County imposing a license tax upon corporations or individuals engaged in the business of carrying persons or freight for hire on railroad cars in the county was void, so far as it assumed to affect the Southern Pacific Railroad Company, as the tax was deemed to be levied upon the use of the franchise granted to the company by the United States, or the operations of the railroad in the exercise of that franchise

It was determined that the franchise of that company and its use were equally beyond the taxing power of the State, or any of its political subdivisions, agreeably to the decision of this court in *California* v. *Pacific Railroad Companies*, which the court felt constrained to obey.

"The franchise" of a railroad, which is contemplated by the state constitution, and authorized to be assessed for taxation by the state Board of Equalization, is nothing but the right to operate the railroad, including the incidental right to charge and take tolls thereon, and the like.

The constitution applies equally to all railroads, whether owned by corporations or associations or individuals, and the assessment provided for is wholly independent of the ownership or the character of the ownership of the railroad property assessed.

The tax proposed by the constitution is consequently and necessarily a tax upon the operations of the railroad, in the exercise of the franchise or right to operate the property.

The right of the Central Pacific Railroad Company to construct, maintain and operate its railroad, in the State of California, was conferred upon the company by and derived by it from the government of the United States, and any assessment of the right of the company to maintain and operate its railroad, in that State, for state taxation, is void, under the Constitution and laws of the United States, whether or not the company received the same right from the State of California.

The right of the company to operate its railroad in the State is a single right, and a single thing, whether the right was derived by the company from one or more than one government, and it cannot be subjected to taxation by the State of California.

In conclusion, it appears, beyond all controversy, that the State imposed burdens, in the way of taxation, upon the exercise of powers and privileges conferred by the Congress of the United States upon the Central Pacific Railroad Company and other companies of the State, rights, powers and privileges which were granted in furtherance of the great object

of Congress in the creation and operation of the overland railroad, and also imposed burdens by taxation upon the mortgage held by the United States as security for the subsidy bonds issued to the company. And for such irregular and illegal action the judgment of the Supreme Court of the State should be reversed.

I have shown that the franchises granted by the State of California to the Central Pacific Railroad Company were abrogated and annulled by express legislation of the State on the 4th of April, 1864, and that the taxation was subsequently made against the railroad company upon an assessment of the value of its franchises thus discarded and thrown away, and after the Federal franchises, that is, franchises derived by grant of the United States, had been substituted in their place and confirmed by the State, with a release of all inconsistent and conflicting provisions with the rights and privileges thus granted.

I have also shown that the assessment of the property of the defendant made in 1887 was twenty-three years after the law was passed abrogating and annulling the franchises of the State upon which the valuation for taxation was made.

I have also shown that the United States hold a lien, constituting a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures and property of every kind and description, as security for certain subsidy bonds issued to the company, and on the refusal or failure of the company to redeem such bonds, or any part of them, when required by the Secretary of the Treasury, in accordance with the provisions of the act, then the road, with all rights, functions, immunities and appurtenances thereunto belonging, also all lands granted to the company by the United States, might be taken possession of by the Secretary of the Treasury for the use and benefit of the United States.

If the taxation levied in the present case can be enforced against the defendant, in face of the facts thus stated, there will be developed a new and unknown power of taxation possessed by the State, in the existence of which I shall not willingly believe.

It seems to me, clear as the sun at noonday, that the taxation imposed by the State of California upon the exercise of the powers, rights, privileges and immunities constituting the franchises of the United States, or of the State to the overland railroad company, or to any of its auxiliary companies, to aid in the construction of the overland railroad and its connecting roads, is directly inimical to the rights and interests of the United States, and that the blending of the franchises of the United States and of the State, and the subjection of either to taxation and to sale, which must follow if the taxation be valid, would necessarily lead to the direct and speedy destruction of the different roads; and thus we should see, in the same century in which this greatest enterprise of our country was undertaken by its government and carried to completion and successful operation, that enterprise utterly destroyed — the completeness of the ruin being marked by the contrast with its original construction and successful operation, rendering its destruction the more significant and deplorable.

I am of opinion that the judgment of the Supreme Court of California affirming the judgment of the Superior Court of the city and county of San Francisco, and an order of that court denying a new trial in an action brought by the people of the State against the plaintiff corporation, should be reversed, and a new trial in that action granted.

MR. JUSTICE HARLAN dissenting.

On the trial of this case in the state court of original jurisdiction, the secretary of the state Board of Equalization, from April, 1880, to March, 1891, was called as a witness by the defendant. His examination showed that he was present at the meetings of that board and kept the record of its proceedings. He said that from his knowledge of what passed at such meetings he could state what elements of value were considered by the board in making their estimate for the total values for 1887. He was asked the following questions separately: "From the various sources of knowledge which you

have enumerated, please state to the court what elements
were taken into consideration by the state Board of Equal-
ization in making the assessment of this company for the year
1887?" "Did you hear any conversation between the mem-
bers of the state Board of Equalization during the meeting
when the assessment of this company was made for the year
1887, with reference to the elements that they proposed to
and did include in the assessment?" "At the time that the
assessment of 1887 was made by the state Board of Equaliza-
tion upon the property of the Central Pacific Railroad Com-
pany, what was said and done at the meeting of the state
Board of Equalization on that day in your presence?"

The State objected to each question, as it was propounded,
and its objection was sustained, the defendant excepting.

The company then made the following offer: "Now, in
view of the ruling of the court on this subject, we now offer
to prove by this witness that from the time of the organiza-
tion of the state Board of Equalization in 1880 down to and
including the year 1887, that board had every year considered
the value of the Federal franchise — that is, the franchise de-
rived from the United States by the acts of Congress of the
government of the United States, belonging to and owned by
the Central Pacific Railroad Company, as an element of value
in assessing the total value of the property of that railroad
company; and that in 1888, in consequence of the decision of
the Supreme Court of the United States upon the subject, the
state Board of Equalization for the first time ceased to con-
sider this Federal franchise as an element of value, and hence
reduced their valuation by the sum of three million dollars
on the Central Pacific Railroad Company's property." This
offer was disallowed, and the company duly excepted.

Notwithstanding this action of the court, the State was
permitted to prove by two members of the board, who par-
ticipated in the assessment of 1887, that the Federal franchise
was not included in that assessment.

One of the findings of fact was in these words: "That in
making its assessment and valuation therefor of defendant's
franchise said state Board of Equalization did not include,

assess or value any franchise or corporate power held or exercised by defendant under the acts of Congress hereinbefore mentioned, or under any act of Congress whatever. And said board, in making said assessment and valuation therefor, upon defendant's franchise, roadbed, roadway, rails and rolling stock, for purposes of taxation for the fiscal year 1887, did not include in its said assessment and valuation therefor any Federal franchise, then possessed by defendant, nor any franchise or thing whatsoever, which said board could not legally include in such assessment or valuation. That the franchise, roadway, roadbed, rails and rolling stock of defendant's railroad were valued and assessed by said state Board of Equalization, for purposes of taxation for the fiscal year 1887, at their actual value, and in proportion to their values respectively."

A statement, on motion, was filed for a new trial and *approved by the court.* In that statement will be found the following: "In its written opinion, upon which the findings were based, the court after determining as a fact, from a preponderance of the evidence before it, that the Federal franchise of defendant was not assessed or included in the assessment of the property of defendant by the state Board of Equalization, for the year 1887, uses the following language: 'But if the parol evidence offered did not weigh in plaintiff's favor, and if by a preponderance of such evidence defendants could have shown that the State intended to and did include a Federal franchise in the assessment, I think the court would have to disregard it as incompetent. The effect of such parol evidence would be to contradict the record, which cannot be done. The best and only evidence of the acts and intentions of deliberative bodies must be drawn from the record of its intentions. . . . From both standpoints of fact and of law, the findings must be that a Federal franchise was not included in these assessments.'"

It thus appears that the trial court permitted the State to prove by oral testimony that the state board did not include the Federal franchises in its assessment, but denied to the defendant the privilege of showing, by the same kind of evidence, that such franchises were, in fact, included in the

assessment. This, in my judgment, was error, and directly affected the proper determination of the Federal question. The recital in the records of the board were not conclusive of the question. If, in fact, the board did include the Federal franchise in its assessment, the defendant should have been allowed to prove it by the best evidence capable of being produced; otherwise, it would be without remedy against a false statement on the records of the board.

Independently of this error, the judgment of the court below should be reversed upon the ground that the franchises of the Central Pacific Railroad Company are not subject to be taxed at all by the State, although some of its visible property may, according to the principles announced in former decisions of this court, be taxable for state purposes.

In the *Sinking Fund cases*, 99 U. S. 700, 710, 727, this court, speaking by Chief Justice Waite, and referring to the Central Pacific Railroad Company, said: "By the act of 1862, Congress granted this corporation a right to build a road from San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of the State, and thence through the territories of the United States until it met the road of the Union Pacific Company. For this purpose all the rights, privileges and franchises were given this company that were granted to the Union Pacific Company, except the franchise of being a corporation, and such others as were merely incident to the organization of the company. The land grants and the subsidy bonds to this company were the same in character and quantity as those to the Union Pacific, and the same right of amendment was reserved. Each of the companies was required to file in the Department of the Interior its acceptance of the conditions imposed before it could become entitled to the benefits conferred by the act. This was promptly done by the Central Pacific company, and in this way that corporation voluntarily submitted itself to such legislative control by Congress as was reserved under the power of amendment. . . . But for the corporate powers and financial aid granted by Congress it is not probable that the road would have been built."

In *California* v. *Pacific Railroad Company*, 127 U. S. 1, 38, this court, referring to the Pacific Railroad acts, so far as they related to the Central Pacific Railroad, said: " Thus, without referring to the other franchises and privileges conferred upon this company, the fundamental franchise was given by the act of 1862 and the subsequent acts to construct a railroad from the Pacific Ocean across the State of California and the Federal Territories until it should meet the Union Pacific, which it did meet at Ogden in the Territory of Utah."

In the case of *United States* v. *Stanford,* 161 U. S. 412, recently decided, we said : " In *United States* v. *Union Pacific Railroad Company*, 91 U. S. 92, this court, speaking by Mr. Justice Davis, held that the construction of a railroad connecting the Missouri River with the Pacific Ocean was a national work, because such a road would be a great national highway, under national control ; that the scheme for establishing that highway originated in national necessities, the country being involved at the time in a civil war which threatened the disruption of the Union, and endangered the safety of our possessions on the Pacific ; and that the enterprise required national assistance, because private capital was inadequate for an undertaking of such magnitude. It appears upon the face of the act of 1862, as amended by the act of 1864, that Congress had in view the promotion of the public interest and welfare by the construction of a railroad and telegraph line that could be used by the government at all times, but particularly in time of war, for postal, military and other purposes, and that, so far as the government and the public were concerned, such road and telegraph were to be operated as one continuous line. These ends were to be attained through the agency of a corporation created by Congress, and of certain corporations organized under state laws which Congress selected as instruments to be employed in accomplishing the public objects specified in its legislation." Again, in the same case: " Although the Central Pacific Railroad Company of California became an artificial being, under the laws of that State, its road owes its existence to the national government; for, all that was accomplished in the

exercise of privileges granted by, and because of the aid derived from, the United States. . . . The relations between the California corporation and the State were of no concern to the national government at the time the purpose was formed to establish a great highway across the continent for governmental and public use. Congress chose this existing artificial being [the Central Pacific Railroad Company] as an instrumentality to accomplish national ends, and the relations between the United States and that corporation ought to be determined by the enactments which establish those relations."

The relations between this railroad company as well to the United States and the State is shown by the act of the legislature of California, approved April 4, 1864, c. 417, entitled "An act to aid in carrying out the provisions of the Pacific Railroad and Telegraph act of Congress and other matters relating thereto," Stat. Cal. 1863, 1864, 471. That statute referred to the act of Congress of July 1, 1862, c. 120, 12 Stat. 489, and to enable the Central Pacific Railroad Company, therein named, more fully and completely to comply with and perform its provisions and conditions, provided that that company "are hereby authorized and empowered, and the right, power and privilege is hereby granted to, conferred upon and vested in them, to construct, maintain and operate the said railroad and telegraph line, not only in the State of California, but also in the said territories lying east of and between said State and the Missouri River, with such branches and extensions of said railroad and telegraph line, or either of them, as said company may deem necessary or proper; and also the right of way for said railroad and telegraph line over any lands belonging to this State, and on, over and along any streets, roads, highways, rivers, streams, water and water courses, but the same to be so constructed as not to obstruct or destroy the passage or navigation of the same; and also the right to condemn and appropriate to the use of said company such private property, rights, privileges and franchises as may be proper, necessary or convenient for the purposes of said railroad and telegraph, the compensation therefor to be

ascertained and paid under and by special proceedings, as prescribed in the act providing for the incorporation of railroad companies, approved May twentieth, eighteen hundred and sixty-one, and the acts supplementary and amendatory thereof; said company to be subject to all the laws of this State concerning railroad and telegraph lines, except that messages and property of the United States, of this State and of the said company shall have priority of transportation and transmission over said line of railroad and telegraph; hereby confirming to and vesting in said company all the rights, privileges, franchises, power and authority conferred upon, granted to or vested in said company by said act of Congress; hereby repealing all laws and parts of laws inconsistent or in conflict with the provisions of this act, or the rights and privileges herein granted."

Looking at the question in the light most favorable to the State, it may be said that the franchises which the railroad company possesses, with reference to the construction and maintenance of its road within California, came jointly from the United States and the State. If the rights, privileges and franchises granted by the United States to this company were not all that was needed for the accomplishment of the objects had in view by the construction of a national highway between the Missouri River and the Pacific Ocean, the state enactment of 1864, carried into the charter of the company, looking at the company simply as a state corporation, all the powers and franchises granted by the United States.

If the assessment in question had been separately upon the visible property of the company, as distinguished from its franchises, the case would have presented a different aspect; and we should then have been compelled to reëxamine the question as to the extent to which the property of the company, used in accomplishing the objects designed by Congress, could be taxed by the State. But, as the opinion of the court shows, the present assessment was upon the franchise, roadway, roadbed, rails and rolling stock of the company without stating separately their respective values. That which was invalid cannot be separated from that which was valid. So

that the question is presented whether it is competent for the State to sell for its taxes the franchise of the company. If it cannot, the whole assessment is void. *Santa Clara County* v. *South. Pacific Railroad*, 118 U. S. 394, 415.

The court says that the railroad company obtained from the State the right and privilege of corporate capacity; to construct, maintain and operate its road; to charge and collect fares and freights; to exercise the power of eminent domain; to acquire and maintain right of way; to enter upon lands or waters of any person to survey route; to construct road across, along or upon any stream, watercourse, roadstead, bay, navigable stream, street, avenue, highway, or across any railway, canal, ditch or flume; to cross, intersect, join or unite its railroad with any other railroad at any point on its route; to acquire right of way, roadbed and material for construction; to take material from the lands of the State, etc., etc.

But did it not acquire those rights and privileges also from the United States? Did not the United States grant "the fundamental franchise" to construct and maintain a railroad from San Francisco across the State and through the territories, until it met the Union Pacific Railroad? If that franchise be sold by the State for its taxes, how are the national objects contemplated by Congress to be accomplished? What becomes of the mortgage of the United States upon the entire property of the company, roadbed, right of way, rolling stock, station houses, etc., which mortgage was taken in order to secure the payment of the bonds issued by the United States under the acts of Congress? What becomes of the power of the United States reserved in the acts of Congress for the General Government, in certain contingencies, to take possession of this railroad? In *Northern Pacific Railroad* v. *Traill County*, 115 U. S. 600, 610, where the question was as to the power of a State or Territory to tax certain lands that had been granted by Congress to aid in the construction of the Northern Pacific Railroad Company, Mr. Justice Miller, speaking for the court, said: "No sale of land for taxes, no taxes can be assessed on any property, but by virtue of the

sovereign authority in whose jurisdiction. it is done. If not assessed by direct act of the legislature itself, it must, to be valid, be done under authority of a law enacted by such legislature. A valid sale, therefore, for taxes, being the highest exercise of sovereign power of the State, must carry the title to the property sold, and if it does not do this, it is because the assessment is void. It follows that if the assessment of these taxes is valid and the proceedings well conducted, the sale confers a title paramount to all others, and thereby destroys the lien of the United States for the cost of surveying these lands. If, on the other hand, the sale would not confer such a title, it is because there exists no authority to make it."

It may be said that the franchise which the State may sell is that which was granted by it. But is the state franchise so distinct and separate from the franchise granted by the United States that it can be sold separately from the franchise granted by the United States? It seems to me that the franchise to build, operate and maintain a railroad from San Francisco to a point of junction with the Union Pacific Railroad is a unit, and that it is utterly impracticable to separate and sell so much of that franchise as originally came from the State, and leave intact that which was derived from the United States. The State cannot lawfully do anything to impair or cripple the franchise, rights and privileges derived from the United States. What was said in *Pacific Railroad Removal cases*, 115 U. S. 1, 16, in reference to the relations between the Union Pacific Railroad Company and certain State corporations which consolidated with that company, is applicable here: " The whole being, capacities, authority and obligations of the company thus consolidated are so based upon, permeated by and enveloped in the acts of Congress referred to, that it is impracticable, so far as the operations and transactions of the company are concerned, to disentangle those qualities and capacities, which have their source and foundation in these acts, from those which are derived from state or territorial authority.".

This court has often declared that the Central Pacific Railroad Company was one of the instrumentalities that had been

selected and was being employed by the United States in accomplishing important national objects, to which the United States is competent under the Constitution.  Upon the franchises, and upon all the property of that corporation, rests a mortgage to secure the government against liability for the bonds it issued to that corporation.  With the consent of the State, if such consent was necessary, that corporation has received large grants of land upon the condition that it would meet and perform all the obligations imposed upon it by the acts of Congress.  I cannot agree that the franchise which the corporation has received from the United States and the State can be assessed by the State for taxation, along with its roadbed, right of way, etc., and then sold.  That is taxation of one of the instrumentalities of the National Government, which no State may do without the consent of the Congress of the United States.  Of course, this corporation ought to contribute its due share to the support of the government of each State within whose limits its property is situated and its privileges exercised.  But it is for Congress to prescribe the rule of taxation to be applied at least to the franchises of the corporation which, although created by the State, is as much a Federal agency as if it had been created a corporation by national enactment.  It has never heretofore been recognized that a State could, without the assent of Congress, sell, for its taxes, the franchises, rights and privileges, employed, under the authority of the National Government, to accomplish national objects, particularly where such franchises, rights and privileges, are under mortgage to secure the government against specified liabilities.

For the reasons stated, I dissent from the opinion and judgment of the court.